**82 P.2d 921**

**LOPEZ v. TOWNSEND et al.**
**No. 4264.**

Supreme Court of New Mexico.

Sept. 24, 1938.

George E. Remley, of Albuquerque, for appellant Scenic Stages, Inc.

Gilbert & Hamilton, of Santa Fe, for appellant American Fidelity & Casualty Co.

Kiker & Sanchez, of Santa Fe, for appellee.

ZINN, Justice.

This is an appeal from a judgment in favor of plaintiff below (appellee here) in the sum of $5,000 awarded by the trial court, without jury, for the wrongful death of plaintiff's husband. The death occurred May 1, 1931.

This case has been heretofore before us on questions of law. See Lopez v. Townsend, 37 N.M. 574, 25 P.2d 809, 96 A.L.R. 342.

The defendants (appellants here) assign seventy-six alleged errors. The seventy-six are summed up under two points, as follows:

1. The evidence was insufficient to show that the death of deceased was caused by negligence of defendant Scenic Stages, Inc. (Defendant American Fidelity and Casualty Company is the insurer of its co-defendant pursuant to the provisions of Art. 10, Ch. 11, 1929 Comp.St. § 11-1001 et seq.)

2. The evidence was insufficient to show that defendant Scenic Stages, Inc., was operating as a common carrier pursuant to a certificate of convenience and necessity at the time of the accident.

Able counsel for all parties have filed voluminous briefs in the case. Plaintiff attempts to dismiss the appeal on technical grounds. It will not be necessary to discuss these in view of the result.

The defendants direct their attack upon the judgment, contending that the evidence does not point to their legal responsibility for the death of the plaintiff's husband. We have been forced to make an independent reading and study of the entire record due to the fact that we have not before us in the briefs an agreed statement of the facts.

Counsel for the defendants summarize the issues tendered by the pleadings as follows:

"1. Was the plaintiff the widow of Venceslao Lopez, deceased?

"2. Was Venceslao Lopez killed through being struck by an automobile operated by Scenic Stages, Inc.?

"3. If so, did the death of Venceslao Lopez proximately result from any of the acts of negligence alleged in the complaint?

"4. If Venceslao Lopez were so killed was he guilty of contributory negligence in any of the particulars alleged in the answers?

"5. If Venceslao Lopez were killed by being struck by an automobile operated by Scenic Stages, Inc., was the automobile being operated at that time as a common carrier under certificate of public convenience and necessity No. 44, or any oth-

er certificate issued by the State Corporation Commission?

"6. If Venceslao Lopez were killed by being struck by an automobile was it the automobile alleged in the complaint, viz., a Buick 1926 model having motor No. 191770-3?"

After a careful study of the record we believe the above to be a fair summary and classified division of the issues before the trial court.

With the exception of the issue tendered by the defendants' answer of contributory negligence, the burden was on the plaintiff to prove by a preponderance of the evidence the controverted allegations of her complaint. The defendants claim that she failed in this.

On the early morning of May 1, 1931, Venceslao Lopez was found injured on the Lamy highway a few miles south of the Santa Fe Plaza. His team of horses hitched to a wagon loaded with wood stood nearby, unattended. The injured man died in an ambulance en route to a hospital in Santa Fe shortly following the discovery of his body upon the highway.

The negligence charged was in effect that the defendants drove their stage at a reckless and dangerous rate of speed; that they failed to pass to the left of the wagon (an overtaken vehicle) although there was ample room to do so but instead passed to the right of the wagon at a dangerous rate of speed and without sounding their horn; that they operated the automobile in excess of ten miles per hour although on a curve which prevented a clear view for one hundred yards ahead; that their stage was operated by an intoxicated driver; that the stage was operated in violation of city ordinances which prohibited the passing of a vehicle on the crest of a grade where the driver does not have an unobstructed view of the road ahead for a distance of five hundred feet and which further prohibits the overtaking and passing of a vehicle to its right.

All of the material issues in the case were resolved in favor of the plaintiff by the trial court. This embraced a finding that the plaintiff was married to the deceased; that his death resulted proximately from injuries received when struck by an automobile operated by Scenic Stages as a public conveyance under or by virtue of a certificate of public convenience and necessity.

In addition, the trial court's findings convict the defendant, Scenic Stages, Inc., of negligence (a) in passing to the right of an overtaken vehicle (the wood wagon); (b) in driving at a speed in excess of 15 miles per hour along a highway where the curvature thereof prevented a clear view ahead by the driver for 100 yards and where, while upon said curve, the driver at no time had a clear view ahead a distance of 100 feet before striking the deceased; (c) that the automobile was operated around said curve at such speed that it could not be stopped within the distance the driver thereof could

see ahead clearly; (d) that the automobile was operated at an excessive speed under the circumstances; and (e) that the driver of the automobile passed said wagon to the right when its passage to the left was open and unobstructed.

The defendants claim that the evidence is insufficient to support the findings and claim that these findings are based on conjecture, on possibilities that are not even probabilities, and that it is a case built up on guesses or presumptions on presumptions.

We do not propose to set forth in this opinion a complete review and résumé of each and every word and inference found in the evidence in order to sustain the trial court's findings of fact. It is sufficient to say that the evidence does support the trial court's material findings and conclusions. A narration of all the evidence would be of little help and unnecessarily voluminous. Some statement of the facts developed at the trial will necessarily be set forth hereafter in this opinion.

It may be true that a much stronger case may or ought to have been proven. However, it is only our duty to ascertain if there is substantial evidence to support the material findings of the trial court and, if found, to sustain the judgment; if not found, to set the judgment aside.

We start with the principle that negligence may be established by circumstantial evidence, and that, where the circumstances are such as to take the case out of the realm of conjecture and within the field of legitimate inference from established facts, then a prima facie case is made.

The evidence establishes that Lopez came to his death as the result of having been struck by an automobile driven by one who failed either to stop or report the accident. We are therefore dealing with a hit and run driver, the most dangerous type of motorist on the road, one who does not give the innocent victim of his negligence even a chance for immediate medical or surgical attention if such be needed, but permits the victim to suffer if alive, and die if death be the result. Such flight is clearly a violation of the law. 1929 Comp.St. §§ 11-828, 11-862. Every legitimate inference will be drawn against such a driver.

This is not a criminal case, however. It was not the burden of the plaintiff to prove beyond a reasonable doubt that the defendant, Scenic Stages, Inc., did, in a negligent and careless manner, kill Venceslao López. It was only necessary for the plaintiff to make out a prima facie case of negligence by circumstances attending the accident. Such circumstances of their own force must render probable the fact that a driver of a Scenic Stages car, operated at the time as a public conveyance, was the responsible human agency causing the injury which resulted in the death of Venceslao Lopez. Where we reasonably can, we should view the evidence as the trial court did. We must measure the probative force of specific circumstances as evidence of what lay behind the physical cause of the death of Venceslao Lopez. We then exam-

ine the record to find therein proof of the issues.

■ 1. Was the plaintiff the widow of the deceased?

The plaintiff testified that she was the wife of Venceslao Lopez at the time of his death. Her testimony, under oath, was believed by the trial judge. He made a finding of fact accordingly, and there is substantial evidence in the record to support this finding. We cannot upset the same.

■ 2. Was the deceased killed by being struck by an automobile operated by Scenic Stages, Inc., in a negligent manner as alleged in the complaint?

Venceslao Lopez was found in a dying condition, bleeding at the mouth and nose, in the middle of a main traveled highway immediately south of Santa Fe, a little after 2 o'clock A. M., the morning of May 1, 1931. He was placed in an ambulance to be rushed to a hospital, but died in the ambulance before arriving there. The visible wounds on the body of the deceased were a cut over his eye, a skinned place on his right hand and arm and a bruised place on his right hip. The evidence on the ground showed that a wagon had driven along the highway close to the right hand edge of the road for a considerable distance and then had veered sharply across the highway to the left. A pool of blood was found some twenty-six feet further along the highway from the point where the wagon had veered to the left. Some broken glass out of a car headlight was found a few feet from this pool of blood. At the right, and off the road, where the wagon tracks had veered to the left, there was visible in the soft wet ground a tire track having a distinctive tread. The road was muddy though the highway itself was gravelled.

The record also shows that Travers Stevens was a driver in the employ of defendant, Scenic Stages, Inc., for the purpose of driving a bus route between Roswell and Santa Fe under a fixed schedule pursuant to which he was due to arrive in Santa Fe between 9 and 9:30 in the evening.

The record shows that at about four or five o'clock on the morning of May 1st, 1931, the Sheriff of Santa Fe County, Jesus Baca, was called over the telephone by one Arthur Alarid, calling from a filling station. The sheriff was told that there had been an accident on the Lamy Road, and that a man had been killed, and " * * * that this man who drove the car was at the Montezuma Hotel."

Acting upon this telephone call the Sheriff of Santa Fe County went to the Montezuma Hotel and called upon Travers Stevens about one-half hour before the sheriff went to the scene of the accident. Baca knocked twice on the door and Stevens did not answer; knocked again and Stevens got up, opened the door and went back to bed. Stevens had a pint whiskey bottle nearby with just a little whiskey in it. Stevens did not appear natural, was groggy and dazed.

Immediately following this visit at Stevens' room the sheriff went to Closson's Garage in Santa Fe and there inspected a seven passenger Buick car of Scenic Stages, Inc., driven into Santa Fe by Stevens the night before. This car had a sign on it "Roswell—Moriarity—Santa Fe." The front fender of the car was bent, headlight broken, the bumper broken and hanging down. The sheriff then went out on the Lamy road to the place where Lopez was found in the road.

An earlier report of the accident had also caused Desk Sergeant Roybal of the Santa Fe Police to go out on the highway prior to Sheriff Baca's visit there. He found on the highway the pool of blood that came from a wound on the head and from the mouth and nose of Lopez. When Roybal got there Lopez was bleeding freely. There was glass on the highway one and one-half or two and one-half feet beyond the pool of blood. This glass came from the headlight of a car. The blood was on the right side of the road, seven feet beyond the east end of the culvert looking toward Santa Fe.

The sheriff made a drawing of the imprint of the tire appearing at the side of the road in the earth. These tire markings in the earth corresponded to the tire of the seven passenger Buick car that had been inspected by the sheriff at Closson's Garage.

The record also shows that the Scenic Stages' automobile was driven by Travers Stevens for some time previously. After all arrivals, previous to May 1, 1931, it was Stevens' custom to come into the station and talk to the night men; but that night, upon arriving from Roswell, he drove the car to the back and went out at the back without talking to any of the garage people. They knew nothing of the condition of the car until Sheriff Baca called in the morning. The night man in the garage testified that the driver of the stage generally got there about nine o'clock, but he remembered nothing definitely about when he arrived that night and it might have been later. There is no positive testimony as to the time the stage arrived in Santa Fe.

The record gives us a fair picture of the contour and condition of the highway where the accident occurred. It shows that from the line of the Santa Fe Grant, going north to Santa Fe, the road is practically level for 1700 feet. Then there is an uphill grade of 5.71% which starts and continues to the crest of a hill. The road, from the zero-zero point at the end of the 1,700 foot stretch, is straight for a short distance, then follows a five percent curve to the crest and over the hill. From the crest of the hill to a culvert in the road it is 350 feet. From the top of the hill the grade down-hill from the crest over said 350 feet is 2.40 percent to the culvert. The five percent curve continues from this crest to within 75 feet of the culvert. From this point (within 75 feet of the culvert) the road is straight to and beyond the culvert. One driving in a car along this five percent curve, north toward Santa

Fe, at a point 150 feet south of the culvert, can see ahead only about 150 feet, daylight visibility. This is due to the curve itself. From the culvert looking north the visibility is about 325 feet.

It is 2,600 feet from the south city limits of Santa Fe. to the culvert mentioned, some 800 feet of which is on the curve and 550 feet of which is up-grade to the crest of the hill mentioned, and 350 feet down to the culvert. All the road described is within the corporate limits of the City of Santa Fe. The only change in the highway in the last six or seven years is that it has been oiled.

Dr. Ward testified that he saw the body of deceased the morning he died; that the deceased had some sort of wound on his forehead. This wound was a cut. That such a blow could have been received by a man standing in the highway if struck by an automobile, and though the blow itself might not cause the death, yet a hemorrhage or concussion of the brain, inferentially the result of such a blow, might cause death.

The doctor testified that if a man in the highway was struck by an automobile producing such a wound as he saw on the forehead of deceased, and the man remained there for a time not to exceed two or three hours and died, and no other cause being shown, and no other bodily injuries, the natural presumption would be, to his mind as a doctor, that the man died from such wound. The doctor qualified his testimony by saying that his examination was purely superficial.

The evidence also shows that appellant Scenic Stages, Inc., in operating the stage between Roswell and Santa Fe, some time during the night of April 30–May 1, 1931, necessarily passed along the road and the place where Lopez was killed.

The right rear tire on the automobile that killed Lopez was of a peculiar tread. The sheriff testified that the tread of the tire on the Buick automobile corresponded to the tread made in the soft dirt off the travelled part of the road. Where the automobile struck Lopez the impact broke out one of the headlights of that automobile and strewed the glass over the highway. The Buick car in the garage also had its headlight broken, its front right fender bent, and bumper broken and hanging down on the right side. It was apparent that the Buick car had struck something just before arriving in Santa Fe. Public stages as a rule do not drive at night with but one headlight, and with a fender and the bumper broken. The car must have struck something, immediately before arriving at Santa Fe, that broke its headlight, fender and bumper.

These several circumstances are such that there is brought within the realm of probability the fact that appellant Scenic Stages' automobile was the car that struck Lopez. Coupled with all this, and to make the probability stronger, we have the fact that the Sheriff of Santa Fe County upon being advised that some one was killed on

the Lamy Road, went directly to the hotel room occupied by Travers Stevens, the driver of the Buick car, and interviewed him. This pointed to the driver as being in some manner connected with the accident. Sheriffs are not accustomed to being called at four or five in the morning and going to a hotel room out of mere curiosity. There was a purpose and motive in the call. Under the circumstances, the telephone call by Alarid, the Sheriff's awakening and visit to Stevens are not guesses, but bear upon the probability that Stevens was the driver of the car that struck Lopez. This conclusion is fortified by the fact that as the result of the Sheriff's visit to Stevens at the Montezuma Hotel, the Sheriff went directly to Closson's Garage and examined the Buick automobile and found the damaging evidence of a collision. He did not go to any other garage or examine any other car. And again, acting on this examination of the car, coupled with his visit to Stevens, preceded by the telephone message of Alarid, the Sheriff went directly out on the Lamy Road to where Lopez had been injured.

All of which shows rather conclusively that the Sheriff having had news of the accident which implicated Stevens by visiting Stevens ascertained the location of the death dealing car in Closson's Garage. It is a logical and natural inference that from Stevens' statements to the Sheriff, the Sheriff was directed to appellant's automobile, and to the place of the injury. It is also a logical and natural inference that Stevens knew at least how and where the injury occurred.

The district court, having all of the above testimony before it, was justified in finding as a matter of fact that Lopez was killed by being struck by the Buick automobile belonging to the Scenic Stages, Inc., while the same was being driven by Travers Stevens, its driver.

Now wherein was the negligence?

The evidence fairly supports an inference that Stevens passed the wagon and team to the right. If Travers Stevens at the time was violating a pertinent statute of the State of New Mexico relating to rules of the road, such violation was negligence per se.

Certain pertinent statutes in effect on May 1, 1931, are as follows:

N.M.Sts.1929, § 11-225. "(a) The driver or operator of any vehicle in or upon public highways within this state shall drive or operate such vehicle in a careful manner, with due regard for safety and convenience of pedestrains and all other vehicles or traffic upon such highways. * *

"(c) Vehicles overtaking other vehicles proceeding in the same direction shall pass to the left thereof and shall not again drive to the right until the road is reasonably clear of such overtaken vehicle."

N.M.Sts.1929, § 11-804. "*Restrictions as to speed.* (a) Any person driving a vehicle on a highway shall drive the same at a careful and prudent speed not greater than is reasonable and proper, having due

regard to the traffic, surface and width of the highway and of any other conditions then existing; and no person shall drive any vehicle upon a highway at such a speed as to endanger the life, limb or property of any person.

"(b) Subject to the provisions of subdivision (a) of this section and except in those instances where a lower speed is specified in this act, it shall be prima facie lawful for the driver of a vehicle to drive the same at a speed not exceeding the following, but in any case when such speed would be unsafe it shall not be lawful."

N.M.Sts.1929, § 11-804. "(b) * * * 4. Fifteen miles an hour in traversing or going around curves or traversing a grade upon a highway when the driver's view is obstructed within a distance of one hundred feet along such highway in the direction in which he is proceeding. The state highway commission shall erect and maintain suitable signs at each end of each such curve, specifying the maximum speed limit permitted in traversing such curve under the provisions hereof."

It was also the duty of drivers of automobiles to look out for wagons drawn by horses and not injure drivers.

N.M.Sts.1929, § 11-225 (i). "Every person having control or charge of any motor vehicle upon any public highway and approaching any vehicle drawn by an animal or animals or any animal upon which any person is riding, shall operate such motor vehicle or other vehicle in such a manner as to exercise every reasonable precaution to prevent frightening of any such animal and to insure the safety of any person riding or driving the same. * * *"

The court warrantably could have believed from the evidence that the deceased was proceeding toward Santa Fe walking beside his loaded wood wagon and team; that his wagon was on the right hand side of the road, although near the center line thereof, at the moment of the accident; that when the lights of the Scenic Stages car, straightening out of the curve, brought the wagon and team within the car driver's vision, there was available to him the whole left side of the road for passage that way with sufficient distance between him and the wagon ahead, if traveling at the careful and prudent speed in view of conditions then existing enjoined by 1929 Comp. § 11-804 (a), for diverting his course to the left hand passage; that there was also room for him to pass the wagon to the right; that choosing to pass to the right, or impelled to such course by careless speed to avoid impending collision with the wagon, the car struck deceased, inflicting injuries from which shortly thereafter he died.

While the evidence was conflicting there was direct and positive testimony that at the point where the wagon tracks suddenly veered to the left across the road, room was available for a car to pass to the left as well as to the right. Furthermore, it was near this point (though necessarily before the tracks veered, the wagon being untouched) that the tire tracks from the automobile were superimposed over the wagon

tracks, finally getting over on the shoulder of the road, then suddenly swerving back on to the highway to avoid striking the edge of the culvert.

Sheriff Baca testified:

"Q. Was there any peculiar markings on the automobile tire? A. Very plain, the ground was very soft and damp, showing the tire mark clearly.

"Q. Please show the Court a diagram of what the tire markings was like. (Witness marking C).

"Q. Now Mr. Baca, over in about what distance from the culvert south did you say that that wagon first diverted from the straight course to the left? A. I would say about 40 or 50 feet from here. It was hard surface and the minute it hit the shoulder the track was quite deep. I could see where the car straightened out to avoid hitting the edge of the culvert."

Traveling toward Santa Fe, the road straightened out of the curve, 75 feet south of the culvert. Measurements placed the sudden veering to the left of the wagon tracks 19 feet south of the culvert. Making due allowance for location of the abruptly veering wagon tracks within the overall length of wagon and team, the court permissibly could have believed that driven at a careful speed while emerging from the mouth of a blind curve upon a dark and rainy night, the driver of the car could have passed to the left as the law requires instead of undertaking passage to the right, as the law forbids.

To say the least, the abrupt turn of the horses to the left, almost at a right angle, was extraordinary. Whether the deceased with reins in hand, conscious that the car was bearing down upon him and his vehicle, gave the reins a sudden left hand jerk in an effort to avoid impending collision, will never be definitely known. This affords a more reasonable explanation, however, in view of the attendant circumstances, than that without suggested rhyme or reason the deceased suddenly blocked the road by turning his team and wagon directly across it. It is significant that the wagon and team escaped uninjured.

All of the above we believe established the fact that the automobile which struck Lopez, and which was driven by Stevens, was driven recklessly in violation of 1929 Comp. § 11-225(c) and § 11-804(a).

Whether the driver's failure to operate at such rate of speed that the automobile could be stopped in time to avoid an obstruction discernible within the driver's length of vision ahead of him (within the range of the car's headlights) is negligence per se, a question passed for decision in Kandelin v. Lee Moor Contracting Co., 37 N.M. 479, 24 P.2d 731, need not now be determined. There is a division of opinion upon the subject. See 42 C.J. 930; 44 A.L. R. 1403, supplemented in 58 A.L.R. 1493, 87 A.L.R. 900, and 97 A.L.R. 546. At least, a failure to do so may constitute negligence as a matter of fact and when found by the court will support a judgment.

Defendants have cited some cases to show the amount of evidence necessary to prove facts by circumstantial evidence. They hold in effect that circumstantial evidence, even in a civil case, must not only be consistent with the theory that authorizes recovery but must be absolutely inconsistent with any other rational theory. Such seems to be the rule in criminal cases. See State v. Johnson, 37 N.M. 280, 21 P.2d 813. We are of the opinion, however, that in civil cases, where circumstantial evidence is relied upon for recovery, the burden of proof resting upon the plaintiff is merely to make out the more probable hypothesis. It is unnecessary that his proof attain a degree that excludes every other reasonable conclusion, as in a criminal case. We think the better reasoned authorities support this rule.

"§ 12. Weight and Sufficiency. In civil cases, it suffices that the evidence, whether direct or circumstantial, creates a preponderance of the proof. In a civil case, circumstantial evidence need not exclude every reasonable conclusion other than that arrived at by the jury." Jones, Commentaries on Evidence, 2nd Ed., Vol. 1, Sec. 12, p. 23.

"Such statements are undoubtedly correct statements of law, and when viewed in the light of the facts of cases wherein made and properly limited to their terms, have no real tendency to conflict. They simply pronounce the rule that if the probabilities are equal there is no preponderance of evidence, the burden of proof has not been sustained, and no recovery can be had; or, in other words, the converse of the text. Similarly the statement in the text may otherwise be stated as the familiar rule that 'in a civil case, proof to sustain a burden of proof need not be beyond reasonable doubt.' So stated it is true beyond question irrespective of whether the application is to proof attempted by circumstantial or direct evidence." Jones, Commentaries on Evidence, 2nd Ed., Vol. 1, Note 30, p. 23, copies p. 24.

In a very recent criminal case decided by this court (State v. Lott, 40 N.M. 147, 56 P.2d 1029) venue was a material issue. We held the evidence substantial although resting entirely on circumstances and refused to disturb the verdict of the jury. There, proof beyond a reasonable doubt was essential and the circumstances produced alone met the requirement of substantiality. See, also, Chicago, R. I. & P. Ry. Co. v. Wood, 66 Kan. 613, 72 P. 215; St. Louis, I. M. & S. Ry. Co. v. Owens, 103 Ark. 61, 145 S.W. 879; Bowling v. Roberts, 235 Pa. 89, 83 A. 600 (upon identity of an automobile).

The case of Hepp v. Quickel Auto & Supply Co., 37 N.M. 525, 25 P.2d 197, is similar to this one, in that circumstantial evidence alone was relied upon to prove the defendant guilty of negligence which resulted in the death of plaintiff's husband. We said [page 202]:

"It is recognized, too, that in proving negligence circumstantially absolute certainty cannot be achieved. As said in Rosellini v. Salsich Lumber Co., supra [71 Wash. 208, 128 P. 213, 215]: 'In this class of cases ab-

solute certainty cannot be required. There must be a point where, if a prima facie case is made, the burden shifts. It then became the duty of the defendant to meet this prima facie case and offer a reasonable explanation of the cause of the accident. Scarpelli v. Washington Water Power Co., 63 Wash. 18, 114 P. 870.'

"The Illinois Appellate Court expresses the same thought, although in different language, in Rost v. Kee & Chapell Dairy Co., 216 Ill.App. 497, where it said: 'Absolute, positive, ocular proof, the law, wisely, does not require. Nor does negligence have to be proven beyond a reasonable doubt. Circumstantial evidence, such as exists here, and by which the mind is impelled to make certain deductions, is sufficient.' "

In the instant case the circumstantial evidence offered by plaintiff points to Travers Stevens as the hit and run driver of the Scenic Stages, Inc., stage which killed Venceslao Lopez. No other hypothesis so reasonable is apparent. The suggestion of the defendants that Lopez may have died from some other cause than being struck by an automobile is unpersuasive.

The rule enunciated in the case of McKinney v. Bissel, Mo.App., 263 S.W. 533, is applicable to this case.

We quote therefrom the following [page 535]: "In Reisenleiter v. United Rys. Co., 155 Mo.App. 89, 134 S.W. 11, this court held, in reviewing the rule announced in Frisby v. Transit Co., supra [214 Mo. 567, 113 S.W. 1059], that slight evidence tending to support the inference that defendant owns or operates the car inflicting an injury, where it is not combated except by a general denial, and there is no intimation that defendant resists the claim on the ground that it was not the operator, will be sufficient. That is the situation we have in this case, and, only slight evidence being sufficient to show that defendant was operating this car, this evidence would unquestionably be sufficient."

The defendants did not even attempt to explain away the similarity of the tire track to the tire on Scenic Stages' car. They did not explain away the connection between the broken headlight glass on the road beside the dying and bleeding body of Venceslao Lopez and the broken headlight on its stage. They made no attempt to explain the unusual dilapidated and broken condition of the stage indicating it had been in a collision or accident. They did not attempt to explain why the Sheriff of Santa Fe County, who was called out of bed on a wet drizzly morning to investigate the accident which took the life of Venceslao Lopez, went to the room of its driver Travers Stevens, and from his room went to the garage where he examined its state and then went to the place of the accident.

No good purpose would be served by setting forth and discussing all of the cases cited in the briefs of plaintiff and defendants which they contend bear, or are thought to bear, upon this question.

We are satisfied to hold that a plaintiff in this kind of case is not obli-

gated to establish the material facts essential to a recovery beyond a reasonable doubt. Such a rule would amount to a denial of justice. It is sufficient if his evidence affords room for men of reasonable minds to conclude there is a greater probability the accident causing the injury happened in a way which fixes liability upon the person charged, than that it happened in a way which absolves him. See St. Germain v. Potlatch Lumber Co., 76 Wash. 102, 135 P. 804, 806; also Hessler v. Moore, 188 Wash. 80, 61 P.2d 1001, 1002, 1003.

The defendants claim that the case has been built on guesses, or presumptions on presumptions. No more so under the facts of this case than in Hepp v. Quickel Auto & Supply Co., supra. In meeting a like contention there, we said:

"The defendant also urges the propriety of the trial court's ruling upon the ground that any verdict for the plaintiff would of necessity be supported by raising 'presumption on presumption.' We are not impressed that such is or would be the case.

"'Reasonable inferences drawn from affirmative facts proven are evidence, and not presumptions built upon other presumptions, as suggested by defendant.' Hardwick v. Wabash R. Co., 181 Mo.App. 156, 168 S.W. 328, 330. See, also, Southwest Cotton Co. v. Clements, 25 Ariz. 124, 213 P. 1005; Nicol v. Geitler, [188 Minn. 69], 247 N.W. 8; Gray v. Hammond Lumber Co., 113 Or. 570, 232 P. 637, 233 P. 561, 234 P. 261. Cf. 1 Wigmore on Evidence (2d Ed.) § 41, p. 258."

Other cases holding that it affords no objection to the judgment that the accident was unseen if circumstances reasonably point to its occurrence in a given way, are: Hasenjaeger v. Missouri-Kansas-Texas R. Co., 227 Mo.App. 413, 53 S.W. 2d 1083; Summerfield v. Wetherell, 82 N. H. 513, 135 A. 147; Tucker v. Railway Co., 227 Pa. 66, 75 A. 991; Pittsburgh, C., C. & St. L. Ry. Co. v. Ervington, 59 Ind.App. 371, 108 N.E. 133, and Waters-Pierce Oil Co. v. Deselms, 18 Okl. 107, 89 P. 212.

 The findings of the court upon the question of negligence in the respects indicated being supported by substantial evidence, will not be disturbed upon appeal. We express no opinion upon sufficiency of the evidence to sustain findings of negligence in other respects. We are satisfied that plaintiff established by a preponderance of the evidence issues numbered one, two and three of the issues heretofore enumerated in this opinion and which the defendants claim she failed to do.

 The issue of contributory negligence on the part of the deceased, Venceslao Lopez, was resolved by the findings and judgment in favor of plaintiff. The evidence was not such as to enable the court to say as a matter of law that the deceased was guilty of contributory negligence. And having found as a matter of fact that he was not, we are unable to disturb that finding.

This brings us to the second major point in the case, viz., whether plaintiff's failure, if she failed, to prove that Scenic Stages operated its route pursuant to a certificate of public convenience and necessity issued by State Corporation Commission, barred recovery.

The statutory rider, certainly as against the named assured, limits the insurer's liability to losses incurred through operations pursuant to such a certificate.

Touching this issue the trial court found: "That on the 20th day of August, 1929, the State Corporation Commission of the State of New Mexico issued a certificate of public convenience and necessity to Capital Stages, Inc., a corporation, authorizing it to operate a motor transportation business from Roswell, New Mexico, to Santa Fe, New Mexico, and intermediate points, for the purpose of carrying passengers and express service between said points over state highways Nos. 2 and 41, and over U. S. Highways Nos. 70 and 470; that said certificate of public convenience and necessity was numbered 44; that thereafter said certificate was assigned by the said holder thereof to the defendant, Charles T. Townsend; and that thereafter, and prior to the 1st day of May, 1931, the said Charles T. Townsend authorized the operation of said passenger and express service over said routes under said certificate of public convenience and necessity by the Scenic Stages, Inc., which said operation by said Scenic Stages, Inc., was thereafter, and prior to the 1st day of May, 1931, duly recognized by the State Corporation Commission of the State of New Mexico; and on the 1st day of May, 1931 the said Scenic Stages, Inc., was operating said passenger and express business between Roswell, New Mexico, and Santa Fe, New Mexico, over the highways as aforesaid, under the permit aforesaid, as a common carrier of passengers and express."

While much space in the briefs of counsel for the respective parties is consumed in arguing a lack of evidence to sustain this finding, and its legal insufficiency, if supported by the evidence, we temporarily pass consideration of the matter. For, if defendant insurer be liable regardless of whether Scenic Stages operated under a certificate of public convenience and necessity, obviously it is unimportant to determine if it did. We think it was liable under the facts here shown whether or not Scenic Stages was a licensed motor carrier.

Under the admitted facts the Scenic Stages was a motor carrier as defined in L.1929, c. 129, § 1(d), 1929 Comp. § 11-1001(d), operating a route between Roswell and Santa Fe under a fixed schedule. Such a carrier is required by the act (1929 Comp. § 11-1005) to deposit with the Corporation Commission a surety bond or policy of insurance from a company authorized to do business in New Mexico " * * * guaranteeing the payment to the public of all losses and damages proximately caused by the negligence or wilful misconduct of such motor carrier, its serv-

ants or agents, in not less than the following amounts, to-wit:" (Here follows schedule of amounts based upon seating capacity of vehicle.)

Said section 11-1005 further provides: "All such bonds or insurance policies shall provide a guarantee of payment of all loss or damage caused as aforesaid by any such vehicle operated upon the highways of this state in the conduct of the business of the motor carrier therein named, *whether or not such vehicle be specified in such bond or policy,* and shall be for the benefit of and subject to immediate suit or action thereon by any person who shall sustain actionable injury or loss protected thereby, notwithstanding any provision in said bond or policy to the contrary; *and every such bond or insurance policy so given shall, in any suit or action, be conclusively presumed to have been given according to and to contain all the provisions of this act.* No such certificate of public convenience and necessity shall be valid and operative until such bond or insurance policy herein named has been filed with and approved by the corporation commission, and no such bond or insurance policy herein named, so filed and approved, shall be cancelled by the surety or company issuing the same except upon and after ten days notice in writing to said corporation commission, and upon such notice being given by the surety or company issuing said bond or insurance policy, the certificate of public convenience and necessity of the person giving such bond or insurance policy shall be revoked unless a new bond or insurance policy shall be filed with and approved by the corporation commission before the date upon which such cancellation becomes effective." (Italics supplied.)

The only distinction we have been able to discover between the indemnity afforded by the so-called non-statutory and the statutory coverage is that the former is confined to indemnity against loss imposed by law for bodily injuries or death to persons other than assured or his employees "arising or resulting from claims upon the assured by reason of the ownership, maintenance or use" of *described* automobiles while used for carriage of passengers for compensation "over authorized routes of the (Corporation) Commission from Roswell, N. M.;" whereas, the latter affords the same indemnity for like claims resulting from the ownership, maintenance or use of *any* automobile of the assured "pursuant to a certificate of public convenience and necessity issued by the Corporation Commission of New Mexico."

Since operation under a certificate of convenience and necessity out of Roswell to Santa Fe necessarily would be over a route authorized by the Corporation Commission and since the phrase "any and all motor vehicles" would, of course, embrace a described automobile, we do not perceive the distinction asserted by defendant's between the two types of coverage. Neither includes the assured or any of his employees as to personal injury, death or property damage. Under both indemnity is

expressly confined to losses incident to ownership, maintenance or use of the automobiles over authorized routes of the commission in transporting passengers for compensation; and, as to the so-called statutory coverage (between which and the other we see no material difference), "pursuant to a certificate of public convenience and necessity." Except to keep insurer informed of the "number and character of the automobiles" employed upon which the premium in part is based (as stated in paragraph N of the policy), no good reason suggests itself for a separate statement of liability in relation to described and undescribed automobiles, the liability in legal effect being substantially the same.

The statutory rider attached to the policy provides: "The policy to which this endorsement is attached is written in pursuance of an is to be construed in accordance with the following law of the State of New Mexico, to-wit, House Bill No. 249, Chapter 129, Laws of 1929, and the rules and regulations of the Corporation Commission adopted thereunder, and is subject to all the provisions thereof. In consideration of the premium of the policy to which this endorsement is attached, the insurer hereby agrees to pay any final judgment within the limits set forth in the schedule below set out for injury to and/or death of persons (with the exception of any employee of the Assured while engaged in the maintenance or operation of any of the Assured's automobiles) and damage to property (excluding property of the Assured or property which is rented or leased by the Assured, or property other than the baggage of passengers in the custody of the Assured or carried in or upon any automobile of the Assured, except as otherwise specified) resulting from the ownership, maintenance or use of any and all motor vehicles pursuant to a certificate of public convenience and necessity issued by the Corporation Commission of New Mexico. *It is further understood and agreed by and between the Insurer and the Assured that the right of any person to recover hereunder shall not be affected by any act or omission of the Assured or any employee, of the Assured with regard to any condition or requirement of said policy, but all terms and conditions of the policy shall remain in full force and be binding as between the Insurer and the Assured; and the Insurer shall be reimbursed by the Assured for any and all loss, costs or expenses paid or incurred by the Assured which the insurer would not be obligated to pay under the provisions of the policy independent of this endorsement.*" (Italics ours)

Undoubtedly this italicized clause has been borrowed from the language of the standard or union mortgage clause employed with respect to a mortgagee's rights under fire insurance policies. It is very similar in form. Writing in 3 Cooley's Briefs on Insurance (2nd Ed.) 1988, in reference to such a provision attached to a fire insurance policy, the author states: "When the policy is intended as a protec-

tion to a mortgagee, there is usually attached to it. a provision that 'this insurance, as to the interest of the mortgagee only therein, shall not be invalidated by any act or neglect of the mortgagor or owner of the property insured.' This clause, though a comparatively recent addition to policies, was construed as early as 1878, in Hastings v. Westchester Fire Ins. Co., 73 N.Y. 141, affirming 12 Hun, 416, as recognizing the mortgagee to be a distinct party in interest, and as creating a new contract, the terms of which had no relation to the contract between the company and the original insured. In Phenix Ins. Co. v. Omaha Loan & Trust Co., 41 Neb. 834, 60 N.W. 133, 25 L.R.A. 679, it was held in effect that the conditions upon which payment should be made, as between the insurer and the insured, did not qualify the right of the mortgagee, in view of the mortgage clause, and therefore the right of the mortgagee to recover was not affected by conditions which, as between insurer and insured, would avoid the policy. This decision was subsequently followed in State Ins. Co. v. New Hampshire Trust Co., 47 Neb. 62, 66 N.W. 9 (on rehearing 66 N.W. 1106)." See, also, Id., 2390; 4 Joyce on Insurance (2nd Ed.) § 2795, p. 4776; People's Savings Bank v. Retail Merchants' Mutual Fire Ass'n, 146 Iowa 536, 123 N.W. 198, 31 L.R.A.,N.S., 455.

The position of the public for whose benefit the policy is issued is akin to that of the mortgagee under the standard or union mortgage clause found in fire insurance policies. Indeed, and apparently in the absence of language so plainly declaring as in the policy before us, the Supreme Court of Tennessee in United States Fidelity & Guaranty Co. v. Allen, 158 Tenn. 504, 14 S.W.2d 724, asserts that recovery in that case might very well rest upon such analogy. The court said [page 725]: "It is asserted by defendant Guaranty Company that its liability should be measured by the liability of Jones & Dillon to the extent of the policy. We think that much is true, but the liability of defendant Guaranty Company might very well be rested on another ground. The rider attached to the policy issued sets out that the real beneficiary of said policy is the state of Tennessee for the use and benefit of the public. This being true, the rights of the public would be similar to those of a mortgagee under a fire insurance policy bearing the standard mortgage clause. A transfer of the interest of the mortgagor, or other acts by the mortgagor, might avoid the policy as to him; but such conduct on the part of the mortgagor would not affect the rights of the mortgagee without notice. Laurenzi v. Insurance Co., 131 Tenn. [644] 664, 176 S.W. 1022; Joyce on Insurance (2d Ed.) § 2795."

The same analogy, and likewise absent policy language so recognizing, suggested itself to Vice Chancellor Bigelow in United States Casualty Company v. Timmerman, 118 N.J.Eq. 563, 180 A. 629. He said [page 632]: "The situation presented by a financial responsibility policy is much like that created by a fire policy with standard mortgagee clause attached. The insurer's

liability to the assured is distinct from its liability to an injured third person. The rights of the latter against the insurer spring from the statute as well as from the policy, just as the rights of the mortgagee are determined by the mortgagee clause. The fire policy remains valid as to the mortgagee, despite a breach of warranty by the assured owner. Reed v. Firemen's Ins. Co., 81 N.J.L. 523, 80 A. 462, 35 L.R.A.(N.S.) 343. Likewise, complainant's policy remains valid as to Godlewska. The company's remedy is an action on the policy against Timmerman."

Upon the former appeal of this case, 37 N.M. 574, 25 P.2d 809, 96 A.L.R. 342, in our opinion on rehearing, we sensed the distinction in liability to the public and to the named assured under this policy. We said [page 814]:

"There remain to be considered the specifications under the proposition that the complaint fails to set forth facts constituting a cause of action. These points are made: * * * (3) failure to allege that the automobile was being operated pursuant to a certificate of convenience and necessity; (4) failure to allege that the automobile was being operated on a route authorized by the Corporation Commission.

"In urging the necessity of such allegations, the casualty company points to provisions of the policy, limiting liability. With these we are not concerned. They affect the insurer's liability to indemnify the assured. In that matter the public is not interested. We look to the rider and the statute."

The insurer will be taken to have appropriated the language quoted supra with a knowledge of the construction given it by the courts in fire policies.

The obvious purpose of this clause is to affirm in the public, for whose benefit the policy is required, a coverage not obtaining in favor of the named assured. Under the terms of this clause, the insurer distinguishes between liability to the named assured (the carrier) and to the public. The breach by named assured of a condition or requirement of the policy fatal to his indemnity leaves unaffected the right of "any person" (the public) to recover thereunder. Furthermore, the named assured agrees to reimburse the insurer for "any and all loss, costs or expenses paid or incurred by the assured which the insurer would not be obligated to pay under the provisions of the policy independent of this indorsement." In other words, where, but for the endorsement, as its draftsman conceived, the policy condition or requirement breached would have barred recovery by all persons, the insurer's waiver of such breach in favor of the public shall not constitute a waiver in favor of named assured as respects the indemnity contracted for by him.

Strong reasons support, whether or not such is the effect of the statute without it, the inclusion of such a provision. These policies are required by law for protection of the public. The motor carrier operat-

ing over a given route knows, or its officers should know, whether it has its certificate of convenience and necessity. The travelling public neither knows, nor has ready means of ascertaining, whether such be the case. A passenger about to purchase a bus ticket and employ the carrier's services will not pause to inquire, nor does this policy provision contemplate that he shall do so, whether such carrier has its certificate of convenience and necessity or has fulfilled other conditions or requirements of the policy essential to its validity as between the carrier and the insurer.

"We must hold the intent of the law is to put financial responsibility behind the operations of the motor transportation company as a protection to those with whom they do business and the public concerned with the safety of the public highways being used by insured in the conduct of the business of a common carrier for hire.

"It is not for the passenger, boarding a vehicle of such carrier to inquire whether the particular vehicle so publicly employed has been put into the service in conformity with lawful regulations; nor for a shipper via such carrier to inquire what vehicle of such owner receives and carries his freight; nor for the public to be deprived of the security provided in the bond against the carrier's negligence by reason of another wrongful act of such carrier in putting into service a vehicle in violation of the rules with which he should comply." Fidelity & Casualty Co.

of N. Y. v. Jacks, 231 Ala. 394, 165 So. 242, 246.

See, also, Hipp v. Prudential Casualty & Surety Co., 60 S.D. 300, 244 N.W. 346.

That the policy in suit was in force there can be no doubt. It not only was issued for the first year but renewed for the second. It contained no provision that it should not take effect until a certificate was issued. True, it conditioned liability upon operations under a certificate. But in the very next sentence it agreed that any act or omission of the assured in respect of such condition should not affect the right of any person to recover under the policy. Obviously, a condition that liability shall not attach save where operations are pursuant to a certificate is a covenant by assured that he will only so operate. Thus, the carrier's "act" in operating without a certificate, while fatal to its own indemnity, is expressly waived by insurer in favor of the public. And, if the carrier might have had the certificate upon proper application, its failure to secure it is an "omission" within this language of the rider.

In Hipp v. Prudential Casualty & Surety Co., supra, one defense was that the policy was not in force. The court said [page 347]: "The first reason is based on the fact that at the time of the accident Moberg was not a licensed motor carrier, but was operating his bus line illegally and without a license or permit, and that the policy had not been approved by the board of railroad commissioners. Whether Mo-

berg was operating his bus line illegally is not material. It is a fact that at the time of the issuance of the policy he was actually engaged in the operation of his bus line and was a motor carrier under the definition found in section 2, c. 224, Session Laws 1925, as amended by section 1, c. 181, Session Laws of 1929. There is no provision of law, nor condition contained in the policy, to the effect that the same shall not take effect until it has been approved by the board of railroad commissioners, and it was in force by express terms from and after noon of the 11th day of December, 1929."

Under this view, the trial court reached the correct result even though it did so by pursuing a false issue. The error, if any, in so doing does not harm the defendant. Lockhart v. Wills, 9 N.M. 344, 359, 54 P. 336.

However, we think this phase of the case may also be disposed of upon a theory entirely consistent with the trial court's finding No. 4, quoted supra. It found that State Corporation Commission related the operations of Scenic Stages, Inc., to the Townsend certificate; duly recognized its operations as under said certificate and acquiesced therein. But the defendant insurer challenges in several respects this finding upon which rests the conclusion of liability against it. This necessitates a present statement of the facts bearing on this issue.

The evidence disclosed that on August 20, 1929, certificate of public convenience and necessity No. 44 was issued to Capitol Stages, Inc., authorizing it to operate over a fixed route a motor transportation business between Roswell and Santa Fe, New Mexico, and intermediate points, for the carriage of passengers and express. On November 15, 1929, the defendant American Fidelity and Casualty Company, a corporation, issued the policy herein sued upon giving name of assured as "Scenic Stages, Inc., and/or Chas. T. Townsend" of Roswell, New Mexico, and the same was deposited with State Corporation Commission.

Within three weeks and on December 7, 1929, this certificate of convenience and necessity No. 44 was transferred by Capitol Stages to Chas. T. Townsend and the transfer was approved by the Corporation Commission on the same date. Still upon the same date Scenic Stages, Inc., was formally incorporated by the Corporation Commission.

The policy, subject to its provisions, extended coverage to certain described automobiles; in addition, in compliance with Laws 1929, c. 129, and likewise subject to policy provisions, it afforded indemnity for all loss or damage caused by any motor vehicle "whether or not such vehicle be specified in such * * * policy."

While plaintiff sought to impose liability through proved use of a described automobile, she was unable to prove, at least did not prove, that the automobile pleaded was in use on the occasion in question; hence, she was relegated to proof that

Scenic Stages, Inc., was operating under a certificate of public convenience and necessity.

On February 4, 1930, by an endorsement on the policy and in exchange for an additional premium, coverage on a certain named vehicle was withdrawn and extended to another described vehicle. Likewise on May 13, 1930, by two separate endorsements and in consideration of additional premiums, coverage was extended to three additional and described motor vehicles.

Thereafter and on October 1, 1930, the policy was renewed in favor of "Scenic Stages and/or Charles T. Townsend of Roswell, New Mexico," as the assured by an endorsement reading: "In consideration of an additional premium of $1,127.88 it is understood and agreed that this policy is renewed for a term expiring October 1st, 1931, subject to all the terms and conditions thereof." Laws 1929, c. 129, § 5 (1929 Comp. § 11-1005), provides: "All insurance policies executed pursuant hereto * * * shall expire on the first day of October of each year, and at no other time."

At the trial, the defendants entered into a stipulation as to what Charles T. Townsend would testify if present, which is as follows: "Mr. Townsend, if here, would testify that Travers Stevens was in the employ of Scenic Stages, Inc., for the purpose of driving a route between Roswell, New Mexico and Santa Fe, New Mexico, under a fixed schedule, pursuant to which he was due to arrive at Santa Fe, New Mexico, between 9:00 and 9:30 in the evening, and that he was employed for no other purpose."

The defendant, American Fidelity and Casualty Company, admitted in its answer that on May 1, 1931, Scenic Stages, Inc., was engaged in operating motor vehicles for hire as public carriers of passengers between the cities of Roswell and Santa Fe and that it was still so engaged at the time of the filing of plaintiff's complaint in July, 1935, but denied that such operation was pursuant to any certificate of public convenience and necessity. It denied that Charles T. Townsend was so engaged at any of said times.

The defendants, Charles T. Townsend and Scenic Stages, Inc., answering separately, denied that Townsend on any of the dates mentioned was operating a motor carrier business between Roswell and Santa Fe but admitted that Scenic Stages, Inc., on May 1, 1931, "was engaged in the business of operating stage coaches and automobiles as a public carrier for the transportation of persons between the cities of Santa Fe and Roswell, New Mexico, and intermediate points, *as alleged in said paragraph.*" (Italics supplied.) In paragraph 8 of the complaint, to which this allegation of the joint answer of Townsend and Scenic Stages was responsive, it had been alleged that Scenic Stages was so operating between Roswell and Santa Fe "as authorized by said Certificate of Public Convenience and Necessity No.

44 * * * and operating under said certificate."

The Motor Transportation Act of 1929 (Laws 1929, c. 129, § 3), 1929 Comp. § 11-1003, prohibited all intrastate motor carriers from operating for hire between fixed termini or over a regular route upon any public highway without a certificate of public convenience and necessity issued by the State Corporation Commission, which commission was given administration of the act. Section 11-1005 provided that no such certificate should be issued until the motor carrier had filed with the commission and obtained its approval either of a surety bond or policy of insurance from a company authorized to do business in New Mexico " * * * guaranteeing the payment to the public of all losses and damages proximately caused by the negligence or wilful misconduct of such motor carrier, its servants or agents, in not less than the following amounts, to-wit:" (Here follows schedule of amounts based upon seating capacity of vehicle.)

Without treating as competent against American Fidelity and Casualty Company the admission in the answer of its co-defendants, Townsend and Scenic Stages, Inc., that the latter, on May 1, 1931, was operating by authority of certificate No. 44 of Townsend (Cf. 22 C.J. 362, § 405), if, indeed, it may be so construed, we think the evidence sustains the finding of the trial court upon this branch of the case. That theory, as above stated, was that Scenic Stages operated by virtue of the certificate held by Townsend and that such operation was acquiesced in by State Corporation Commission. If so, failure to have formal transfer of the certificate from Townsend to Scenic Stages was a mere omission or default on the part of Scenic Stages upon which the insurer expressly bound itself by policy provision not to rely. This provision, taken from the standard mortgage clause of fire policies, already has been quoted.

The trial court found Travers Stevens was the negligent driver of the Buick seven-passenger bus, found in Closson's garage, which struck and killed Venceslao Lopez. Travers Stevens, the man who was driving the Buick bus, labeled "Roswell-Moriarity-Santa Fe", had been continuously driving the car into the garage regularly for some time previous to May 1, 1931. It is admitted that certificate of public convenience and necessity No. 44 was issued to Capitol Stages, Inc., a corporation, to operate over highways between the cities of Roswell and Santa Fe, New Mexico, and that said certificate was endorsed to the defendant, Charles T. Townsend, and that on the same day said endorsement was approved by the State Corporation Commission, Scenic Stages, Inc., was incorporated; that application theretofore had been made to defendant, American Fidelity and Casualty Company, for a policy of insurance as required by L.1929, c. 129, insuring the defendant Scenic Stages, Inc., and/or Charles T. Townsend as common carriers, and that the insurance policy

was issued under said application, its issuance being pursuant to the provisions of Section 5, Chapter 129, Laws of 1929.

Now this much is certain. The policy became effective to cover joint operations of the two assured named in the policy or the separate operations of either. The statute provides, to be sure, that the policy must be filed with the commission before a certificate is issued. 1929 Comp. § 11-1005. But this policy cannot be catalogued as a mere incident to an abortive attempt to secure a certificate. If so, why the repeated endorsements withdrawing and extending coverage as to described cars? And why the annual renewal on October 1, 1930? The operations of someone related themselves to a certificate which this policy was given to secure. Was that someone Townsend or Scenic Stages, Inc.? All defendants admit Townsend was not operating on May 1, 1931. Scenic Stages was operating on May 1, 1931 and had been operating for "some time" previous thereto a motor carrier passenger service between Roswell and Santa Fe with Travers Stevens who drove the seven passenger Buick sedan on the day in question as one of its regular drivers.

Townsend held a certificate covering and rendering lawful operations by him on a route from Roswell to Santa Fe. Scenic Stages was a corporation operating this route. The insurer defendant recognized some connection between Townsend and Scenic Stages in connection with such certificate and such operations because it issued and later renewed its policy insuring the operations of one and/or the other and such policy was in force at the time of the injury. The policy stipulated that cancellation notices, effective as to both assured, might be served on Scenic Stages alone. Whatever Townsend's connection with Scenic Stages, it was sufficiently intimate that his competency to testify in detail as to the nature of Travers Stevens' employment by it, the scope of his duties as driver of its stages, the termini of its route, the kind of schedule maintained and its arriving time in Santa Fe, was in no manner questioned.

It was unlawful for Scenic Stages to operate over this line without the authority of a certificate of convenience and necessity. 1929 Comp. § 11-1003. A severe penalty was imposed for doing so. Section 11-1039. Scenic Stages operated with or without the knowledge of the commission on May 1, 1931 and for a considerable time prior thereto. It was required to file with the commission on or before the 20th day of each month a report containing data respecting operations for the preceding month for purpose of calculating the tax imposed by the act. Sections 11-1007 and 11-1008. In view of these considerations it seems improbable that Scenic Stages could operate for any appreciable period without the knowledge of the Corporation Commission. So viewing the matter, the trial court concluded that the Commission related Scenic Stages' operations to the certificate held by its co-insured, Townsend, and found that the

operations of Scenic Stages under the certificate held by Townsend were "* * * prior to the 1st day of May, 1931, duly recognized by the State Corporation Commission of New Mexico."

Whether the Commission was authorized in this fashion to validate operations without the formal issuance or transfer to Scenic Stages of said certificate, a power vigorously challenged by the insurer defendant, we need not determine. At least, it reflects that failure to have formal transfer or issuance of certificate to it was due to default of Scenic Stages in requesting same. It is thus brought within the express policy provision quoted supra whereby insurer agrees that the right of "any person to recover hereunder shall not be affected by any act or omission of the assured * * * with regard to any condition or requirement of said policy," etc.

The defendant insurer places chief reliance on Interstate Casualty Co. v. Martin, Tex.Civ.App., 234 S.W. 710; Allen v. American Fidelity & Casualty Co., 5 Cir., 54 F.2d 207. See, also, Frohoff v. Casualty Reciprocal Exchange, Mo.App., 113 S.W.2d 1026. In none of these cases does the opinion disclose language in the policy providing that the right of any person to recover thereunder shall not be affected by any act or omission of the assured with regard to any condition or requirement of the policy.

The plaintiff also assigns as cross-error the following, occurring while Sheriff Baca was on the stand, to-wit: "Judge Kiker: We offer to prove by Mr. Baca that at the time (he) had this talk with Stevens, Stevens told him that he was the driver of the bus of the Scenic Stages then in the Closson Garage, and that he told him that out on the Lamy highway he struck an object in the highway, and that at the time he was driving rapidly, at a speed of about 45 miles an hour."

The trial court refused the tendered testimony. In view of the result reached, it obviously is unnecessary to consider this cross-assignment. Finding no error, the judgment under review will be affirmed.

It is so ordered.

HUDSPETH, C. J., SADLER and BICKLEY, JJ., and IRWIN S. MOISE, District Judge, concur.