709 P.2d 649

**UNITED NUCLEAR CORPORATION, a Delaware Corporation, Plaintiff-Appellee,**

v.

**ALLENDALE MUTUAL INSURANCE COMPANY, a Rhode Island Corporation, Defendant-Appellant.**

**Nos. 15094, 15104.**

Supreme Court of New Mexico.

Oct. 15, 1985.

Rehearing Denied Dec. 5, 1985.

Seth D. Montgomery, Montgomery & Andrews, P.A., Santa Fe, and Robins, Zelle, Larson & Kaplan, Harding A. Orren, Minneapolis, Minn., for defendant-appellant Allendale Mut. Ins. Co.

G. Stanley Crout, Stephenson, Carpenter, Crout & Olmsted, Santa Fe, Peter J. Nickles, Covington & Burling, Washington, D.C., and Russell Moore, Robert H. Clark, Keleher & McLeod, Albuquerque, for plaintiff-appellee United Nuclear Corp.

John J. Kircher, Milwaukee, Wis., and White, Koch, Kelly & McCarthy, P.A., Santa Fe, for amicus curiae Federation of Ins. Counsel.

Mitchell, Alley & Rubin, Santa Fe, and LeBoeuf, Lamb, Leiby & MacRae, Washington, D.C., for amicus curiae Com'r of Ins. of State of Iowa, Director of Business Regulation, and Ins. Com'r of State of Rhode Island, et al.

## OPINION

RIORDAN, Justice.

Plaintiff United Nuclear Corporation (UNC) brought suit under two different policies of insurance against defendants Allendale Mutual Insurance Company (Allendale) and its subsidiary, Appalachian Insurance Company (Appalachian). Each insurer provided different coverage to UNC. UNC sought reimbursement for business interruption and property damage losses that occurred when a tailings embankment failed at UNC's Churchrock uranimum mill site. Both Allendale and Appalachian denied coverage. The trial court, finding coverage under Allendale's policy, awarded judgment to UNC for losses and damages, including attorney's fees, prejudgment interest and punitive damages. The trial court found in favor of Appalachian. Al-

lendale appeals. We affirm in part and reverse in part.

The issues on appeal are:

I. Whether the trial court erroneously construed an exclusionary provision in Allendale's policy of insurance.

II. Whether the punitive damage award against Allendale is unlawful and unconstitutional.

III. Whether the award of attorney's fees against Allendale was unreasonable and an abuse of discretion.

IV. Whether the trial court's award of compensatory damages is supported by substantial evidence.

V. Whether the award of prejudgment interest against Allendale is error.

## I. Policy Coverage.

On July 16, 1979, the earthen tailings dam at UNC's Churchrock uranium mill failed, releasing 94 million gallons of tailings and causing the mill to be shut down. At the time of the dam failure, the Allendale insurance policy issued to UNC provided coverage for:

> *Collapse* of buildings, structures or a material part thereof in excess of $25,000 for each occurrence, except that there shall be no liability for loss or damage caused by or resulting from flood, earthquake, landslide, *subsidence or any other earth movement. Collapse shall not mean settling*, cracking, shrinking, bulging, or expansion of pavements, foundations, walls, floors, ceilings or roofs. (Emphasis added.)

Allendale's refusal to honor UNC's claim for coverage was based in part on the ground that the dam failure was excluded under the "subsidence or any other earth movement" exception. Allendale also disputed the amount of damages claimed by UNC under various other provisions of the policy.

All parties agree that the "collapse" was caused by "differential settlement." Allendale argues that differential settlement is a kind of "subsidence" and cites four dictionary definitions which, by various interrelated words, draw a connection between the

two terms. We would agree that there is similarity between the events described by "settlement" and by "subsidence," but the terms are not necessarily synonymous. Indeed, during argument on a motion for directed verdict, Allendale's counsel stated that he understood the terms to mean different things. One of Allendale's experts expressed an "explicit difference" in that one event was a "cause" and the other an "effect."

As UNC points out, the language used in the policy and the manner of expression indicate a distinction between "settlement" and "subsidence." The collapse provision explains that "[c]ollapse shall not mean *settling* * * * of pavements, foundations, walls, floors, ceilings or roofs." In its own "Collapse Guidelines for Adjustors," an exhibit at trial, Allendale advised its adjustors that "settling," unless accompanied by "significant physical deformation (falling) of the component and material impairment of the structural integrity of the structure," does not mean "collapse." UNC argues that this language demonstrates that minor settlement resulting in cosmetic damage is excluded from policy coverage but Allendale's guidelines acknowledge that, even though "settling" is specifically excluded, in some cases of settlement when it is accompanied by or results in physical deterioration and material impairment of the structure, there *is* coverage under the policy.

■ UNC's analysis is in accord with previous interpretations of similar clauses. *Morton v. Great American Ins. Co.,* 77 N.M. 35, 419 P.2d 239 (1966), held that "settling" that impaired the structural integrity of the building constituted "collapse." In *Barash v. Ins. Co. of North America,* 114 Misc.2d 325, 451 N.Y.S.2d 603 (1982), the court said that "settling, shrinking or expansion" meant normal wear and tear only. Thus, we determine that the trial court did not err in finding that the "differential settlement" that caused the collapse at the Churchrock uranium mill site was not a form of "subsi-

dence" that would have been excluded under the Allendale policy.

Alternatively, Allendale argues that if coverage is not excluded under the "subsidence" exception, loss by "differential settlement" must be excluded as "any other earth movement." Allendale construes this phrase to cover *all* earth movement, and relies on *Kolner v. Director, Federal Emergency Management Agency,* Ins. Law Rep. (CCH), 1983 Fire and Casualty Cases, p. 1129 (N.D.Ill.1983), for the assertion that "earth movement" is unambiguous. However, in *Kolner* all the experts agreed that the direct cause of the damage was "earth movement." The issue there was whether that exclusion applied when the earth movement itself was *caused by flood*—a covered peril. The question in *Kolner* did not concern the definition of the term of "earth movement." However, in the instant case the scope of the term "earth movement" *was* at issue. The trial court construed the term to cover only "other naturally occurring phenomenon" in addition to "flood, earthquake, landslide, [and] subsidence."

In construing the term "earth movement" to cover only naturally occurring phenomenon, the trial court applied the doctrine of *ejusdem generis.* Numerous other cases have applied the doctrine to the term "earth movement." *See e.g. Peach State Uniform Service, Inc. v. American Ins. Co.,* 507 F.2d 996 (5th Cir.1975); *Gullett v. St. Paul Fire & Marine Ins. Co.,* 446 F.2d 1100 (7th Cir.1971); *Wyatt v. Northwestern Mutual Ins. Co. of Seattle,* 304 F.Supp. 781 (D.Minn.1969); *Wisconsin Builders, Inc. v. General Ins. Co. of America,* 65 Wis.2d 91, 221 N.W.2d 832 (1974); *Government Employees Ins. Co. v. DeJames,* 256 Md. 717, 261 A.2d 747 (Md. App.1970); *Anderson v. Indiana Lumbermens Mutual Ins. Co. of Indianapolis, Indiana,* 127 So.2d 304 (La.App.1961). Indeed, one of Allendale's own internal communications discussed the *Wyatt* case and its holding and acknowledged that the term "earth movement" would most likely be construed to apply to naturally occurring phenomenon.

484

The general rule of construction for insurance contracts is as follows:

> Terms used in a policy which have by prior judicial decisions been given a definite meaning, will be regarded as being used in view of such established construction and be governed thereby; and if the insurer continues to issue, without change, policies, clauses of which have been judicially construed, it will be considered as issuing them with that construction placed on them, even though such construction violates the literal sense of the words used.

*Patterson v. United States,* 233 F.Supp. 447, 449 (E.D.Tenn.1964) (quoting 44 C.J.S. *Insurance* § 293 (1945)). Allendale issued its policy of insurance to UNC in July, 1977. All of the cases interpreting "earth movement" to apply only to naturally occurring phenomenon (cited above) were decided prior to issuance of the policy here in question. Thus, Allendale is considered to have issued its policy to UNC with the prior judicial interpretations given to the term "earth movement." Further, New Mexico recognizes this general rule of construction. *See Lopez v. Townsend,* 42 N.M. 601, 82 P.2d 921 (1938).

■ Therefore, we determine that the trial court did not err in applying the doctrine of *ejusdem generis* to the term "earth movement" and thereby finding that the exclusion in the Allendale insurance policy did not apply to the tailings dam spill at UNC's Churchrock uranium mill site.

## II. Punitive Damages Award.

The trial court found Allendale's conduct in handling and denying UNC's claim for coverage to be "willful, wanton, malicious and in reckless disregard of the rights of its insured." Based primarily on that finding, punitive damages of $25 million were assessed against Allendale. Allendale claims that the award of punitive damages is unlawful and unconstitutional because Allendale had a reasonable basis for denying coverage to UNC and questioning the amount of UNC's claimed losses. Allendale further argues that the standard of proof to determine punitive damages should be a clear and convincing standard; Allendale also argues that an award of $25 million in punitive damages is excessive. We will address Allendale's standard of proof argument first.

New Mexico has never declared the standard of proof required to establish a justification for punitive damages. Allendale urges this Court to follow the lead of Indiana, Wisconsin and other jurisdictions in adopting a requirement of "clear and convincing" evidence. *See e.g., Travelers Indem. Co. v. Armstrong,* 442 N.E.2d 349 (Ind.1982); *Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 294 N.W.2d 437 (1980). In support of this higher evidentiary test, Allendale emphasizes that parties "against whom punitive damages are sought stand accused of highly opprobrious, morally reprehensible behavior." Because they must face society's scorn as well as the monetary assessment, Allendale argues that defendants who are held liable in punitive damages are denied due process, the opportunity to present their side of the case, and to their fair day in court unless the standard of clear and convincing evidence is imposed on the trier of facts. We are not convinced that due process is offended when morally reprehensible conduct is shown by substantial evidence which preponderates in favor of the finding.

Allendale correctly notes that the "clear and convincing" test has been applied in this jurisdiction for determining *compensatory* liability in cases where defendant was accused of libelous or fraudulent wrongdoing, citing *e.g., Hummer v. Betenbough,* 75 N.M. 274, 404 P.2d 110 (1965) (undue influence); *Mason v. Salomon,* 62 N.M. 425, 311 P.2d 652 (1957) (fraud); *Terrel v. Duke City Lumber Co.,* 86 N.M. 405, 524 P.2d 1021 (Ct.App.1974), *rev'd in part on other grounds, Duke City Lumber Co. v. Terrel,* 88 N.M. 299, 540 P.2d 229 (1975), (economic compulsion "like fraud"). However, we do not read *Hummer* to require the higher degree of proof; we note, however, that other New Mexico cases cited and those which we have researched all deal with

allegations of fraud or are concerned with the "clear and convincing" burden established by statute—usually in connection with termination or deprivation of licenses or basic and inherent individual rights (*e.g.*, termination of parental rights).

■ It is the general rule, not only in New Mexico but elsewhere, that issues of fact in civil cases are to be determined according to the preponderance of the evidence. *See* NMSA 1978, UJI Civ. 3.6 (Repl. Pamp.1980). As demonstrated by our adopted civil jury instructions and by New Mexico case law (*e.g.*, *Campbell v. Campbell*, 62 N.M. 330, 310 P.2d 266 (1957)), the requirement of clear and convincing proof to sustain an issue claimed is the exception rather than the rule. We are not disposed to enlarge the areas of the exception's application. We note that in *Whitehead v. Allen*, 63 N.M. 63, 313 P.2d 335 (1957), decided more than a quarter of a century ago, it was said that the jury's finding of breach of contract, "wanton in character and maliciously intentional," and the accompanying award of punitive damages, were "based upon substantial evidence." Clearly, Allendale knew at the commencement of trial what degree of proof UNC would be required to produce, and also knew what the evidence would be on the issues of wrongful denial and wilful and reckless disregard of UNC's rights. We are not convinced that the degree of proof should be changed in punitive damage areas.

We now address the issue of whether the punitive damage award was erroneous.

■ It has been held in New Mexico that:

> Punitive or exemplanary damages may be awarded only *when the conduct of the wrongdoer may be said to be maliciously intentional, fraudulent, oppressive, or committed recklessly or with a wanton disregard of the plaintiffs' rights.*

*Loucks v. Albuquerque National Bank*, 76 N.M. 735, 747, 418 P.2d 191, 199 (1966) (emphasis added.) To assess punitive dam-

ages for breach of an insurance policy there must be evidence of bad faith or malice in the insurer's refusal to pay the claim. *Anderson v. Dairyland Ins. Co.*, 97 N.M. 155, 158, 637 P.2d 837, 840 (1981); *Curtiss v. Aetna Life Ins. Co.*, 90 N.M. 105, 108, 560 P.2d 169, 172 (Ct.App.), *cert. denied*, 90 N.M. 7, 558 P.2d 619 (1976). "Bad faith" has been defined as meaning "any frivolous or *unfounded* refusal to pay * * *." *State Farm General Ins. Co. v. Clifton*, 86 N.M. 757, 759, 527 P.2d 798, 800 (1974) (emphasis added).

■ In the instant case, although the questions of coverage were the major reasons given by Allendale for not paying UNC's claim, they were not the *only* reasons. There remained questions regarding the amount of damages available to UNC under its insurance policy with Allendale. UNC's amended complaint sought $30,032,152 in compensatory damages. The trial court judgment for UNC was for $24,670,724 in compensatory damages, a difference of $5,361,428. These are very substantial differences in the amount claimed and the amount awarded. It cannot reasonably be argued that Allendale did not have a legitimate reason to question, in a court of law, the amount of damages claimed by UNC. There existed legitimate issues under various policy provisions regarding UNC's claim for lost net operating profits, extraordinary costs, carrying costs and costs of repair. Therefore, since there were legitimate questions regarding the amount of UNC's claimed damages, as is evidenced in the trial court's judgment awarding substantially different amounts than those claimed by UNC, we cannot say that Allendale's failure to pay UNC's claim was malicious or in bad faith (i.e., an *unfounded* refusal to pay). Thus, we determine that the trial court's award of $25 million in punitive damages was erroneous and therefore reverse on that issue.

## III. Attorney's Fees.

The trial court awarded UNC attorney's fees and costs in the amount of $3,210,759

by authority of NMSA 1978, Section 39–2–1, which reads:

In any action where an insured prevails against an insurer who has not paid a claim on any type of first party coverage, the insured person may be awarded reasonable attorney's fees and costs of the action upon a finding by the court that the insurer acted unreasonably in failing to pay the claim.

In arriving at the attorney fee award of $3,210,759, the trial court determined a "lodestar" figure by using the number of hours worked by UNC's legal counsel and multiplying that number by the attorneys' hourly billing rate. This "lodestar" figure was then increased by a multiplier of three which represented, in the trial court's view, a proper enhancement for the exceptional success of UNC's attorneys in prosecution of the suit and for the advancement of public policy in litigated insurance claims, as shown by the punitive damage award.

■ Although it can be argued that Allendale was unreasonable in failing to at least acknowledge coverage to UNC due to Allendale's mistaken interpretation of the various exclusions contained in the policy, it does not follow that Allendale was unreasonable in failing to pay UNC's claim since as we previously determined, Allendale had a reasonable basis for questioning the amount of UNC's claimed damages under the various policy provisions. We cannot say that Allendale was unreasonable in failing to pay UNC's claimed damages under the policy. *C.f. Urania Enterprises, Inc. v. Travelers Indem. Co.*, 335 So.2d 757 (La.App.1976) (insurer entitled to present breach of policy condition as defense to liability and therefore should not be charged with penalty or fee for failure to pay the claim). Thus, we determine that the trial court's award of attorney's fees to UNC was error and therefore reverse.

■ Further, although unnecessary to our determination of the issue, we feel the "lodestar" method used to determine the amount of attorney fees and the multiplier allowed by the trial court are inappropriate in this type of case. The "lodestar" and multiplier have generally been applied in civil rights cases and class action suits. Compare, *McKinnon v. City of Berwyn*, 750 F.2d 1383 (7th Cir.1984) (civil rights action); *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4 (D.C.1984) (civil rights action); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2nd Cir.1974) (private antitrust national class action); *In re Fine Paper Antitrust Litigation*, 98 F.R.D. 48 (E.D.Pa. 1983) (class certified antitrust action).

## IV. Compensatory Damages Supported by Substantial Evidence.

■ Allendale attacks the award of $24,670,724 in compensatory damages as being unsupported by substantial evidence. While objecting to "numerous other problems and errors" in the court's calculations and decision, Allendale makes three specific challenges to the award.

■ Allendale first claims error in the trial court's refusal to consider certain receipts by UNC from the sale of borrowed yellowcake. It contends the profit from those sales should have been offset against the business interruption losses caused by the dam failure, thus reflecting no loss of net profits by UNC. The trial court found, on evidence produced by UNC, that the borrowings and sales relied on by Allendale to support its argument were normal business practices of UNC and would have occurred even in the absence of the dam collapse. Consequently, that income would have had no bearing on lost income from UNC's own production. Additionally, the argument of Allendale gives no recognition to UNC's obligation to repay the borrowings. At the time of trial, there was evidence that sales on borrowed uranium had no impact whatever on UNC's losses from the shut-down of production; there also was testimony that the sales of borrowed uranium created no profits for UNC over its liability for repayment, or over the profit ordinarily to be anticipated by UNC in its engagement in this type of business practice common to the industry.

UNC makes a further point in refutation of Allendale's contention: The Allendale policy covers "loss of production," not "loss of sales." In its Adjuster Manual, Allendale rejects the argument it now makes, and instructs its adjusters that with respect to business interruption claims, "[t]he insured should never be given the impression that our policy covers loss of sales[;] it covers loss of production. The insureds do not have to prove a loss of sales." If UNC would have made sales on borrowed supplies whether or not its own production had been interrupted, that income is irrelevant to a determination of the covered loss of production. The court's findings regarding UNC's lost net operating profits, *resulting from interruption of its own production* and its consequent inability to accept bids from willing purchasers, is supported in the evidence and will not be disturbed on appeal. *Howard v. Howard*, 100 N.M. 105, 666 P.2d 1252 (1983).

■ Allendale next objects to the trial court's finding that UNC could not have made up its loss of production within a one-year period following repair of the damaged property, which Allendale delineates as the "reasonable time" required by the policy. Without citation to any authority, Allendale argues that the policy provision requiring its insured to make up lost production "through the use of any property * * * obtainable from other sources" obligated UNC to buy yellowcake on the open market. Again, Allendale misreads its own policy. It is "production" which is to be made up, not "sales." The argument advanced by Allendale was specifically rejected in *Gordon Chem. Co. v. Aetna Casualty & Surety Co.*, 358 Mass. 632, 266 N.E.2d 653 (1971). We decline to hold that a mineral producer must buy the refined product from other sources to satisfy the "make-up of lost production" requirement of its business interruption coverage.

Finally, Allendale disagrees with the trial court's conclusion that only one day of the long delay in UNC's getting back to full operating capacity was because of govern-

ment regulation of construction or repair. Any increases in business losses resulting from compliance with "law and ordinance" requirements are excluded from the policy coverage. There was significant and substantial evidence presented by UNC on the various causes of delay, including the need to investigate the cause of the collapse, development of repair designs, acquisition and testing of repair materials, and inability to repair the dam during the winter months.

■ Although there was some evidence UNC might have restructured portions of the tailings area to permit earlier resumption of milling, there was also evidence that UNC partially resumed operations as early as October, 1979 with modified facilities. But the overall repair delay was complicated by conflicts among the engineers regarding making repairs before design, engineering and construction plans had been fully examined and proven. If those delays occasioned by principles of engineering prudency overlapped the same delay period imposed by standards of a regulatory body that had to be met before production could be restarted, it cannot be said that delay was due only to the "law and ordinance" regulation of reconstruction and repairs. The trial court's determination regarding the effect of governmental regulation does not fail for lack of substantial evidence.

In its generalized attack on the amount of the compensatory damage award, aside from the specific objections addressed above, Allendale contends that the trial court made an error of $519,724 in the award for extraordinary losses. We note that UNC requested a finding of $4,566,902 for that item of damages and of $2,203,719 for carrying costs, based upon exhibits it submitted at trial; Allendale requested a finding of no extraordinary losses or carrying costs; and the trial court awarded damages to UNC of $3,464,240 and $1,859,591, repsectively. Allendale's argument is that UNC referred in a footnote in its post-trial brief to a figure of $2,944,516 as the amount of extraordinary expenses, not compensated under the Appalachian policy,

to partially make up for lost production or to reduce loss. Allendale says the difference between the amount awarded and the amount discussed in UNC's brief shows the trial court's "superficial" consideration of the damage issues.

■ The trial court obviously rejected $1,102,662 of UNC's request for a finding of extraordinary loss damages of $4,566,-902, and disallowed $344,128 of its requested finding of $2,203,719 for carrying costs and for fixed, ongoing administrative and overhead expenses. Since the evidence could have supported a larger amount of damages in each category of loss and UNC has not appealed the court's reduction of the amounts claimed, we do not see how Allendale has been injured. The footnote reference relied upon by Allendale obviously conflicts with other evidence of loss that was introduced at trial. Precise mathematical certainty of computation is not required when the evidence encompasses the monetary amount allowed. *Acme Cigarette Services, Inc. v. Gallegos,* 91 N.M. 577, 577 P.2d 885 (Ct.App.1978).

The trial court's award of compensatory damages within the range shown by the evidence is affirmed. *See Jackson v. Goad,* 73 N.M. 19, 385 P.2d 279 (1963); *Wirth v. Commercial Resources, Inc.,* 96 N.M. 340, 630 P.2d 292 (Ct.App.), *cert. denied,* 96 N.M. 543, 632 P.2d 1181 (1981).

### V. Prejudgment Interest.

■ As its last point of error on appeal Allendale argues that the trial court erred in awarding prejudgment interest of 6% from March 21, 1980, (the date of Allendale's denial of UNC's claim), to date of judgment. Allendale argues that prejudgment interest was not allowable because the compensatory damage amount was neither liquidated nor ascertainable as of the date of denial, citing *O'Meara v. Commercial Ins. Co.,* 71 N.M. 145, 376 P.2d 486 (1962). Contract damage awards against one who fails to perform should fully compensate the injured party for all damages naturally flowing from such breach. *Shaeffer v. Kelton,* 95 N.M. 182, 619 P.2d

1226 (1980). Prejudgment interest is meant to compensate a plaintiff for injury resulting from deprivation of the promised performance and for loss of the use and earning power of plaintiff's own funds that have been expended as a result of a defendant's failure to pay. *Id.*

The allowance of prejudgment interest is governed by NMSA 1978, Section 56–8–3, which at the time of trial and judgment provided:

The rate of interest, in the absence of a written contract fixing a different rate, shall be six percent per annum, in the following cases:

A. on money due by contract * * *.

Where the amount in question is fixed or liquidated, prejudgment interest should be awarded as a matter of right. *Shaeffer v. Kelton,* 95 N.M. at 188, 619 P.2d at 1232. Where the amount is ascertainable, prejudgment interest may be awarded at the judge's discretion. *Id.; O'Meara v. Commercial Ins. Co.*

■ In the instant case, the amount payable to UNC under Allendale's policy was not finally settled until judgment. Because UNC claimed several different amounts between the filing of the complaint and the time of trial, Allendale argues that an award of prejudgment interest is precluded. However, in a leading case on the allowance of prejudgment interest in this state, this Court adopted Wisconsin's theory that:

[Mere] difference of opinion as to amount is * * * no more reason to excuse [defendant] from interest than difference of opinion whether he legally ought to pay at all, which has never been held an excuse.

*State Trust & Savings Bank v. Hermosa Land & Cattle Co.,* 30 N.M. 566, 597, 240 P.469, 481 (1925) (quoting *Laycock v. Parker,* 103 Wis. 161, 79 N.W. 327 (1899)).

Since the amount of UNC's damages was ascertainable and the award of prejudgment interest was within the trial court's discretion, and since neither a claim nor proof of abuse of discretion has been made

or shown by Allendale, we affirm that portion of the judgment as well.

The judgment of the trial court is affirmed in part and reversed in part.

IT IS SO ORDERED.

STOWERS, J., concurs.

BIVINS, Judge (concurs in part, specially concurs in part).

SOSA, Senior Justice, and WALTERS, J. (concur in part, dissent in part).

BIVINS, Judge, Court of Appeals (concurring in part; specially concurring in part).

I concur in the discussion and results as to issue I, "Policy Coverage" and issue IV, "Compensatory Damages Supported By Substantial Evidence." I concur in the results reached as to issue II, "Punitive Damages Award," issue III, "Attorney Fees," and issue V, "Prejudgment Interest," but base my decisions on different grounds.

For the sake of clarity, I will use the same numbering and captions as appear in Justice Riordan's opinion.

## II. Punitive Damages Award.

Justice Riordan reverses the punitive damages award on the basis that Allendale had a legitimate reason to question compensatory damages as demonstrated by the difference between what UNC claimed and what the trial court awarded. While I agree that a well-founded ground for challenging the issue of compensatory damages may be considered in determining whether an insurer's failure or refusal to pay a claim rises to the level that would warrant punitive damages, I do not believe that under the circumstances of this case that ground alone suffices to answer the question presented. It is the conduct of Allendale relating to its collapse coverage provision that must be analyzed in order to determine if the punitive damages may stand. If this were not so, then a defendant could defeat an award of punitive damages simply by challenging the compensatory damages claim. Could a drunken driver, for example, who left the roadway, cutting down pedestrians on the sidewalk, escape punitive damages simply by raising a legitimate challenge to the claim of pain and suffering by those who survived?

It should be noted at the outset that UNC did not seek damages in tort for bad faith failure to pay its claim, *see State Farm General Insurance Co. v. Clifton*, 86 N.M. 757, 527 P.2d 798 (1974); rather, it sought punitive damages in addition to the damages contemplated by the parties at the time of making the insurance contract. Such damages are recognized in a breach of contract action, but there must be a showing of malice or of reckless or wanton disregard of the insured's rights. *Clifton; Bank of New Mexico v. Rice*, 78 N.M. 170, 429 P.2d 368 (1967); *Loucks v. Albuquerque National Bank*, 76 N.M. 735, 418 P.2d 191 (1966); NMSA 1978, UJI Civ. 18.27 (Repl.Pamp.1980).

In discussing the type of conduct that would justify punitive damages, the court of appeals in *Curtiss v. Aetna Life Insurance Co.*, 90 N.M. 105, 560 P.2d 169 (Ct. App.), *cert. denied*, 90 N.M. 7, 558 P.2d 619 (1976), said that " '[a]n act characterized as "willfully" or "maliciously" * * * denotes the intentioned [sic] doing of a harmful act *without just cause or excuse* or an intentional act done in utter disregard for the consequences, * * *.' " *Id.* at 108, 560 P.2d at 172 (emphasis added), *quoting Potomac Insurance Co. v. Torres*, 75 N.M. 129, 131–32, 401 P.2d 308, 309 (1965).

*Curtiss* upheld an award of punitive damages where the insurer intentionally refused to pay on a health policy claim, after plaintiff suffered a heart attack, because he was unable to take a physical examination. In the present case, the trial court awarded punitive damages, finding that Allendale denied coverage by relying on "a recognized ambiguity," and that by its efforts to generate a basis for denial of liability, Allendale acted willfully, wantonly, maliciously, and in reckless disregard of the rights of its insured. The trial court also found that Allendale's refusal to allow

UNC's claim was vexatious and without reasonable cause.

In its findings of fact on punitive damages, the trial court relied on sixteen exhibits as illustrative of the conduct giving rise to the award. These exhibits fall into three categories: (1) internal memoranda reflecting that for some time prior to the Churchrock claim, Allendale and its parent company, Factory Mutual, had been concerned with the "catastrophic" claims under its collapse peril provision, (2) a legal opinion on a similar failure of a gypsum dike, known as the Beker claim, and (3) documents relating to UNC's claim.

The appellate courts in this state have previously held that:

"[w]here all or substantially all of the evidence on a material issue is documentary * * * [we] will examine and weigh it, and will review the record, giving some weight to the findings of the trial judge on such issue, and will not disturb the same upon conflicting evidence unless such findings are manifestly wrong or clearly opposed to the evidence."

*First National Bank in Albuquerque v. Energy Equities, Inc.*, 91 N.M. 11, 14, 569 P.2d 421, 424 (Ct.App.1977), *quoting Valdez v. Salazar*, 45 N.M. 1, 7, 107 P.2d 862, 865 (1940). Here, given the nature of conduct necessary to warrant a punitive damages award, the findings are wrong and opposed to the evidence.

As to the first category of exhibits, Allendale experienced, starting in 1974, "dramatic increases" in "catastrophic collapse losses." By March 1979 and before the Churchrock failure, Allendale had decided that, in order to keep its collapse losses within allowable limits, it would need to reduce those losses by $50 million over a five-year period, or $10 million a year. UNC argues that Allendale rejected legitimate methods of loss reduction because these would, taking a quote from one of defendant's memoranda, "seriously impair [Allendale's] marketing efforts." UNC claims that Allendale embarked upon an illegitimate effort to refuse to pay valid collapse claims by leaving an ambiguous collapse provision in the policy, continuing to use it to entice customers, handling each "sticky" loss as it came along, preserving its ability arbitrarily to deny coverage, and forcing its confused insureds to litigate for collapse benefits which they thought that they had purchased. In short, the picture UNC paints, and the one apparently adopted by the trial court, is that of an insurance company luring its customers with an ambiguous coverage provision, taking their premiums, and then arbitrarily denying their claims, whether legitimate or not.

A review of the evidence will not support such a characterization or the findings made. Contrary to UNC's claim, the statement regarding impairment of marketing efforts was in reference to the unilateral withdrawal of the collapse coverage from all policies, not the rejection of legitimate methods of loss reduction. Withdrawal of this particular coverage was also rejected because of the time involved in securing approval within the Factory Mutual system (referring to other affiliates) as well as approval from the several states in which the companies did business.

The goal of reducing collapse losses by $50 million over five years involved, contrary to the implication attached by UNC, legitimate underwriting techniques, such as raising premiums, increasing the deductible, or placing limits on liability. A fair reading of the document does not admit of any other interpretation.

Nor will the evidence support a wholesale, arbitrary denial of collapse claims. UNC, in an effort to demonstrate that like claims were treated differently, points to an outside attorney's opinion to an Allendale affiliate. In the letter opinion, the attorney concluded that the failure of the dike wall on the Beker claim would qualify as a collapse. Allendale contends that the affiliate disagreed with the opinion and paid the claim. Further, it argues that the policy in the Beker claim excluded coverage for a collapse, whereas the UNC policy covered collapse peril. Thus, by considering the loss not a collapse, Allendale con-

tends that its treatment in both cases was consistent. While it would appear that Allendale is correct, it is unnecessary to resolve the question. Assuming UNC's interpretation of the handling of the two claims is correct, one isolated instance does not establish a concerted effort arbitrarily to deny legitimate claims, nor does it evidence bad faith or willful conduct. Many factors may enter into the handling of a claim, not the least of which is the amount involved and whether a serious dispute exists as to the validity of the damages, as in the present case. Had Allendale embarked on a course of arbitrarily denying collapse claims without any basis, surely the extensive discovery in this case would have turned up more than the Beker claim.

Finally, the trial court's findings refer to loss claim documents relating to the Churchrock failure. Among these is an investigative report which suggests that Allendale attempted to soften certain words and phrases favorable to its position. Further, the "cut and paste" denial of liability letter (containing copies of policy provisions interspersed in the body of a letter) is referred to in the trial court's findings. It is difficult to see where these documents, standing alone, provide any basis for a finding of wanton or malicious conduct. The denial letter sets forth rather thoroughly, if not exhaustively, Allendale's position, but then suggests a meeting to review the points. Where the outcome of the action turned primarily on semantics, in both the legal as well as the engineering sense, it would not be unreasonable for a party carefully to choose words supportive of its position, as long as that position is fairly debatable.

What the evidence does reflect is that Allendale was content to leave its collapse peril provision alone, without attempting to clarify the coverage, and "to handle each sticky situation as it developed." Had Allendale utilized the claimed ambiguity to its advantage, while arbitrarily refusing to pay legitimate claims, as UNC claims, an argument might be made that such conduct would justify punitive damages. As discussed above, however, outside the Beker claim, the record does not reflect that type of conduct. As a matter of fact, the failure to redefine the collapse provision may have actually worked to the advantage of the insureds, as evidenced by the loss experiences. One Allendale memorandum referred to the collapse provision as a "bonanza * * * handed to the insured * * * [that] has certainly haunted us over and over."

In my opinion, the failure of Allendale to clarify the language of its policy falls short of the conduct necessary to justify an award of punitive damages. In fact, a perusal of the cases discussed by Justice Riordan under issue I, "Policy Coverage," reveals that the collapse peril provision bears a striking resemblance to the language used by other companies. It was perhaps not so much the lack of clarity in the language of the exclusionary clause (i.e., "subsidence or any other earth movement") that resulted in this litigation; rather, it was the strained construction Allendale attempted to place on that language.

Nevertheless, while that construction or the failure to clarify the language of the policy might justify the trial court in finding Allendale's failure to pay unreasonable, as discussed later under the attorney's fee issue, it would not justify punitive damages. The situation here differs from those cases relied on by UNC, such as *Sparks v. Republic National Life Insurance Co.*, 132 Ariz. 529, 647 P.2d 1127, *cert. denied*, 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982). In *Sparks*, the insurance company, being fully aware of the grievous nature of the insured's injuries and staggering medical bills, nonetheless decided to deny continuing benefits based on patently ambiguous and previously undisclosed provisions of the insurance policy. There was no economic coercion in the present case, only reliance on exclusionary language which the insurer probably should have known would be construed against it. To award punitive damages against a litigant for seeking construction of contract language would subject most contract disputes to these types of dam-

ages. I do not believe that punitive damages were ever intended to reach that far.

There is an equally compelling reason why the punitive damages award cannot stand. This involves the definition of "collapse" and Allendale's right to litigate whether the failure at Churchrock constituted a collapse.

At the beginning of this discussion, I quoted from *Curtiss* that "willful" or "malicious" denotes the intentional doing of an act without just cause or excuse. This language recognizes that where a claim is "fairly debatable," the insurer is entitled to debate it, whether the issue concerns a question of law or fact. *Anderson v. Continental Insurance Co.*, 85 Wis.2d 675, 271 N.W.2d 368 (1978). *See also Gulf Atlantic Life Insurance Co. v. Barnes*, 405 So.2d 916 (Ala.1981).

This principle has also been recognized and adopted by this court. In *Anderson v. Dairyland Insurance Co.*, 97 N.M. 155, 637 P.2d 837 (1981), the court, *citing with approval Crawford v. American Employers' Insurance Co.*, 86 N.M. 612, 526 P.2d 206 (Ct.App.1974), *rev'd on other grounds*, 87 N.M. 375, 533 P.2d 1203 (1975), said that not all actions taken by an insurer to the detriment of its insured justify punitive damages. In *Crawford*, the court of appeals upheld the refusal by the trial court to submit to the jury the issue of punitive damages where the insurer knew two and one-half years before trial that a serious question of coverage existed. The *Crawford* court said, "[a]lthough the actions of the Insurer could be characterized as entirely self-interested they do not rise to the level of being 'maliciously intentional, fraudulent, oppressive, or committed recklessly or with a wanton disregard of the Plaintiff's rights.'" *Id.* at 621, 526 P.2d at 215, *quoting Loucks v. Albuquerque National Bank*, 76 N.M. 735, 418 P.2d 191 (1966).

In order to examine the legitimacy of Allendale's stand in defending against UNC's claim, it is helpful to lay out again the collapse coverage provision:

*Collapse* of buildings, structures or a material part thereof in excess of $25,000 for each occurrence, except that there shall be no liability for loss or damage caused by or resulting from flood, earthquake, landslide, *subsidence or any other earth movement. Collapse shall not mean settling*, cracking, shrinking, bulging, or expansion of pavements, foundations, walls, floors, ceilings or roofs. (Emphasis added.)

Allendale denied coverage, first, on the ground that the failure of the dam did not constitute a "collapse"; and, second, if it did, the collapse was caused by "subsidence or any other earth movement," which are excluded. Even if Allendale's denial of coverage based on the exclusionary phrases, "subsidence or any other earth movement," may have been unreasonable; Allendale was entitled to a factual determination as to whether the failure at Churchrock constituted a collapse.

The collapse peril provision has spawned much litigation. *See* Annots., 72 A.L.R.2d 1287 (1960); 71 A.L.R.3d 1072 (1976). As the author of the annotation in 71 A.L.R.3d 1072 points out, the question of whether, in a given case, the loss comes within the collapse coverage provision turns on two overriding considerations. The first involves the form of the insuring clause. Some policies insure against collapse without defining that term by qualification or exclusion. Other policies contain qualifying or exclusionary language. For instance, the qualifying or exclusionary language might provide that "collapse" does not mean "setting, cracking, shrinking, bulging or expansion," as the qualifying language does in the policy before us. The second overriding consideration affecting coverage involves how a court, in a given case, determines that "collapse" should be interpreted. *Id.* at 1075.

Where the term "collapse" was used without qualifying language, courts are sharply divided in interpreting the term. Some courts take the position that "collapse" is an unambiguous term which denotes a falling in, loss of shape, or reduc-

tion to flattened form or rubble. *See* cases collected in 71 A.L.R.3d at 1079. In sharp contrast, a more liberal view has been taken by other courts, following the lead of *Jenkins v. United States Fire Insurance Co.*, 185 Kan. 665, 347 P.2d 417 (1959). In *Jenkins*, the court ruled that the settling, cracking, bulging or breaking of all or part of the insured property, in a manner that materially impairs its basic structure or substantial integrity, is a "collapse" within the meaning of the policy if the occurrence is caused by unusual or extraordinary circumstances which were unforeseeable by the parties when they contracted. New Mexico followed *Jenkins*, in *Morton v. Great American Insurance Co.*, adopting the Kansas court's interpretation of "collapse." 77 N.M. 35, 419 P.2d 239 (1966).

Because the substantial conflict in other jurisdictions which had interpreted "collapse" provided some evidence that the term, when standing alone, was ambiguous, *Morton* construed "collapse" in favor of the insured. Therefore, the qualifying language found in the more recent policies, and the one before us, was apparently added by insurance companies in response to *Jenkins*. *Krug v. Millers' Mutual Insurance Association*, 209 Kan. 111, 495 P.2d 949 (1972). The qualifying language was intended to counter the ambiguity courts found in the word "collapse" standing alone. *Id.*

Because this court relied on the Kansas case of *Jenkins* in construing the term "collapse" without the qualifying exclusionary language, it is important to this discussion of Allendale's conduct to consider *Krug*. *Krug* construed "collapse" with the added qualifying exclusionary language. In *Krug*, summary judgment for the insurer was upheld. The policy in *Krug*, similar to Allendale's policy, insured against "collapse (not settling, cracking, shrinkage, bulging or expansion) of building(s) or any part thereof * * *." The lower court held that because the insured's claim involved a loss caused by settling of his home, due to water leakage, the policy provision was not ambiguous. The insured could not recover on the theory that the

exclusionary language referred only to normal settling and cracking.

We need not decide whether New Mexico would go along with *Krug* in holding that the clause with the qualifying language is unambiguous; that issue is not now before us. This court, however, should decide, at the very least, that a fact question existed as to whether the Churchrock failure constituted a "collapse," in order to determine whether the issue was "fairly debatable."

UNC's Churchrock dam, a massive structure 5,700 feet in length and ranging from twelve to thirty-eight feet in height, was constructed in 1976. Its thickness varied from 180 feet at the base to sixty feet at the crest. In 1977, embankment cracking was observed at two locations. These cracks were repaired. A year later, additional cracking at the extreme southern end of the dam was observed. Engineering reports associated these cracks with differential settlement transverse to the embankment, due to differential wetting of the soils. Concerned with the cracking of the dam, UNC adopted a monitoring program and engaged an engineering company.

On July 16, 1979, a leak was discovered in the dam near the southwest corner of the southernmost tailings pond. When first observed, the break was fifteen feet wide; eventually it opened to thirty-seven feet. Investigation as to cause reflected differential settlement at a transition zone between the bedrock and the alluvial soil under the dam. This differential settlement caused a crack in the dam which allowed the liquid waste to escape from the downstream face of the dam.

The trial court found:

9. The breach was both a material and substantial impairment of the structural integrity of the dam and *a falling down or caving* in of a material portion of the tailings dam, and constituted a collapse. (Emphasis added.)

While Allendale disagrees with this finding, because of the substantial evidence

rule, it does not challenge it on appeal. Nevertheless, Allendale contends, and I agree, that it had a right to debate the fact issue as to whether or not the failure constituted a collapse. There was evidence, which if accepted, would have warranted a finding that the dam did not fall into a flattened mass, but rather developed a hole which grew over a period of time. The policy did not cover losses resulting from normal settlement, cracking or the like. Without citing any supporting authority, UNC counters saying that, "[w]here settling causes a collapse—that is, significant physical deformation and material impairment of the structural integrity—the collapse is covered." At least one case suggests the contrary. In *La Salle National Bank of Chicago v. American Insurance Co.*, 14 Ill.App.3d 1027, 303 N.E.2d 770 (1973), the court rejected a similar argument by the insured, holding in part that:

> [i]t is not at all clear that characterization of the * * * sinking as a collapse would operate to bring the loss within the policy since the underlying cause of such collapse would still be a settling of the supporting soil and with it, a portion of the building's foundation and floors.

*Id.* at 774. That case, like the one before us, involved settlement due to soil saturation.

Even if UNC's contention that a collapse occurs, regardless of the underlying cause, where there is significant physical deformation and material impairment of the structural integrity of the insured property, the fact finder must nevertheless determine how a mile-long earthen dam collapses. One expert engineer said that "collapse" is not normally used to describe a dam failure. Arguably, then, is there any difference between a thirty-seven foot breach in a dam, caused by differential settlement due to moisture saturated soils, and a separation of a wall from a ceiling due to settlement caused by soil saturation. *See Krug* which held that, as a matter of law there was no coverage under similar policy language. *See also Eaglestein v. Pacific National Fire Insurance Co.*, 377 S.W.2d 540 (Mo.App.1964).

Moreover, because this court in *Morton* followed Kansas' liberal approach (*Jenkins*) in construing "collapse" without the qualifying exclusionary language, it would not be unreasonable for an insurer to seek a more restrictive construction with the additional language in light of the later Kansas case (*Krug*).

This court in *Morton,* referring to the ambiguous term "collapse" without the qualifying exclusionary language, said, "[a]pplying well-established principles, the question of whether the condition of the building in the instant case is within the interpretations of the clause * * * is a question of fact for the trier of the facts." 77 N.M. at 39, 419 P.2d at 242. If interpretation of the term "collapse" without the qualifying language is a question of fact, surely interpretation of the term with the qualifying language is also.

Other courts have reached a similar result. In *Bailey v. Hartford Fire Insurance Co.*, 565 F.2d 826 (2nd Cir.1977), summary judgment for the insurer was reversed because of the existence of fact questions and the unsettled state of the law. The court said:

> [t]o be sure, no hard and fast rule has emerged in New York nor in other jurisdictions. See 72 ALR 2d 1287. In sum, the expression 'collapse of building or any part thereof' in terms of insurance coverage, is a coat of varied colors. The question of what constitutes a collapse is largely one of degree.

*Id.* at 830. *See also Gullett v. St. Paul Fire & Marine Insurance Co.*, 446 F.2d 1100 (7th Cir.1971).

UNC does not dispute the existence of a fact question, but contends that the trial court was compelled to find in its favor. UNC calls our attention to testimony by Dr. Sangrey, an engineer hired by Allendale, who said that to defend an overly restrictive definition or use of "collapse" would "prove fruitless" because of the "very wide use of the word by engineers." Dr. Sangrey readily admitted, however, that he did not know how the term "relates

to the insurance community"; that is, how it would be construed legally as applied to a given set of facts. Neither did Allendale, but faced with a demand in excess of $30 million, it was entitled to find out, particularly given the wide range of interpretations by courts as to the meaning of "collapse." *See* 71 A.L.R.3d 1072–1104.

The record reflects some question on the part of UNC and its representatives as to the merits of its claim during the investigatory stage. Also, the fact that UNC sued both Allendale, which provided collapse peril coverage, and Appalachian, which did not, provides some evidence that UNC was not absolutely certain of its position. Had there been no genuine issue as to liability, undoubtedly summary judgment would have been sought and perhaps granted. This did not occur.

Because the question of whether the failure at Churchrock constituted a collapse presented a fact question which Allendale was entitled to debate, I would hold that as a matter of law, no punitive damages could be awarded. Quite aside from the fact that Allendale achieved, by going to trial, some measure of success in reducing UNC's demand by over $5 million, it should be noted that according to the evidence, it would have been possible for the trial court to have decided in the insurer's favor any one of several substantial compensatory damage items, which would have reduced the damages even more.

Allendale urges this court to follow the lead of Indiana, Wisconsin and other jurisdictions by adopting a "clear and convincing evidence" standard for punitive damages claims. *See, e.g., Travelers Indemnity Co. v. Armstrong,* 358 Ind. 65, 442 N.E.2d 349 (1982); *Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 294 N.W.2d 437 (1980). Because the facts in this case would not justify an award of punitive damages under the lesser "preponderance of the evidence" standard, it is unnecessary to reach the question of whether it would justify such an award under a clear and convincing evidence standard.

I would reverse the award of punitive damages and remand with instructions to delete that element from the judgment.

## III. Attorney's Fees.

Allendale first argues that the award of $3,210,759 on attorney's fees cannot be sustained because it had a reasonable basis for denying coverage. That the actions or inactions of Allendale did not rise to the level which would justify an award of punitive damages does not answer the question whether an award of attorney's fees can be upheld. Different standards of conduct are involved.

As previously discussed, in order to recover punitive damages, there must be a showing of malice or of reckless or wanton disregard of the insured's rights. To allow an award of attorney's fees, however, the insured need only prevail and show that the insurer "acted unreasonably in failing to pay the claim." NMSA 1978, § 39–2–1.

The appellate courts of this state have not had occasion to discuss this statute, although an award of attorney's fees was upheld in *Stock v. ADCO General Corp.,* 96 N.M. 544, 632 P.2d 1182 (Ct.App.), *cert. denied,* 96 N.M. 543, 632 P.2d 1181 (1981), as supported by the evidence. The court of appeals did not, however, set out express guidelines for making such an award.

Under some statutes, the insured, upon recovering on the policy, is automatically entitled to a reasonable attorney's fee, such statutes being compensatory in nature. *Halliday v. Farmers Insurance Exchange,* 89 Idaho 293, 404 P.2d 634 (1965). *Cf.* NMSA 1978, § 38–1–10. In contrast, other statutes hold it necessary to establish fault on the part of the insurer in order to recover attorney's fees, these statutes being punitive in nature. *Meshell v. Insurance Co. of North America,* 416 So.2d 1383 (La.App.1982). Because New Mexico's statute does not automatically award attorney's fees upon recovery by the insured, but requires a showing of unreasonableness in failing to pay the claim, it falls within the punitive class statutes. As such, it must be strictly construed and ap-

plied with caution so as not to intimidate the insurer from raising a defense in good faith. *McGowen v. St. Paul Guardian Insurance Co.*, 422 So.2d 637 (La.App. 1982).

In order for the insured to recover attorney's fees, he must prove that the insurer acted unreasonably in failing to pay the claim. *Wood v. Detroit Auto-Inter-Insurance Exchange*, 413 Mich. 573, 321 N.W.2d 653 (1982). The trial court in the present case found Allendale's refusal to pay "without reasonable cause." The question then is whether the evidence will support that finding.

Even if it can be said that Allendale's reliance on the "subsidence or any other earth movement" exclusion was unreasonable in light of court decisions construing similar claims as relating to natural phenomenon, nevertheless, the insurer could reasonably have asserted, as a defense, the fact question as to whether the Churchrock failure constituted a collapse. *See Strickland v. Prudential Insurance Co. of America*, 278 S.C. 82, 292 S.E.2d 301 (1982). An insurer is not liable for the statutory penalty when there is some reasonable ground, whether based on law or fact, for refusing to make payment. *McGowen v. St. Paul Guardian Insurance Co.* The same applies to attorney's fees. Allendale had a right to seek a determination as to whether the coverage provision applied. It was not unreasonable for it to do so.

Because an award of attorney's fees cannot be upheld in this case, it is unnecessary to discuss the reasonableness of the award or the "Lodestar" approach.

## V. Prejudgment Interest.

While I agree that the award of prejudgment interest should be upheld, I disagree with the approach taken and believe it, along with *Grynberg v. Roberts*, 698 P.2d 430 (1985), will lead to confusion in later cases. We are not concerned with NMSA 1978, Section 56-8-4 (Cum.Supp.1984) which was enacted after the filing of this action.

In *O'Meara v. Commercial Insurance Co.*, 71 N.M. 145, 152, 376 P.2d 486, 490–91 (1962), this court said:

[T]he allowance of interest as an element of the total damage, under the circumstances here present, is a matter of discretion in the trier of the facts, and not a matter of right under the statute. *See*, 1 Restatement of the Law, Contracts, § 337, wherein the rule is stated as follows:

"If the parties have not by contract determined otherwise, simple interest at the statutory legal rate is recoverable as damages for breach of contract as follows:

"(a) Where the defendant commits a breach of a contract to pay a definite sum of money, or to render a performance the value of which in money is stated in the contract or is ascertainable by mathematical calculation from a standard fixed in the contract or from established market prices of the subject matter, interest is allowed on the amount of the debt or money value from the time performance was due, after making all the deductions to which the defendant may be entitled.

"(b) Where the contract that is broken is of a kind not specified in Clause (a), interest may be allowed in the discretion of the court, if justice requires it, on the amount that would have been just compensation if it had been paid when performance was due."

In my view, subsection (a) of the Restatement does not apply because the contract of insurance did not provide for payment of a "definite sum of money," or for performance, the value of which "is ascertainable by mathematical calculation from a standard fixed in the contract or from established market prices." From a discussion of the issue of compensatory damages, it is clear that the determination of damages was not calculable in the manner required for application of subsection (a). *Cf. Sundt v. Tobin Quarries, Inc.*, 50 N.M. 254, 175 P.2d 684, 169 A.L.R. 586 (1946) (holding under the facts of the case that

quantity calculable and prices were ascertainable).

The present case, as with *O'Meara*, falls within subsection (b) of the Restatement, § 337. *See also Kennedy v. Moutray*, 91 N.M. 205, 572 P.2d 933 (1977). The award was discretionary, if justice requires it, and resort to calculations is not needed. *See also Moorhead v. Stearns-Roger Manufacturing Co.*, 320 F.2d 26 (10th Cir.1963). Both *O'Meara* and *Moorhead* involved, as does the case before us, property damage claims under insurance policies. In *O'Meara* and *Moorhead*, prejudgment interest was not awarded. In both cases, the refusal to award was upheld. In the case before us, the same principle should apply in upholding, as a discretionary act, the award of prejudgment interest. No claim has been made of abuse of discretion.

Allendale assumes that the trial court awarded prejudgment interest based on Restatement § 337(a). Conclusion of law number 12 simply says UNC is entitled to prejudgment interest from the date of the denial of the claim, March 21, 1980. No reference is made to mathematical calculations. Thus, the award of interest may be sustained under subsection (b). Because the trial court's exercise of discretion has not been challenged, we need not search the record to justify it.

WALTERS, Justice, dissenting. SOSA, Senior Justice, concurring in dissent.

We concur with the opinion of Justice Riordan in its discussion of Policy Coverage and Compensatory Damages. We agree with Judge Bivins's discussion regarding the award of prejudgment interest. We disagree on the denial of punitive damages and attorneys fees and, therefore, respectfully dissent from the opinion of the majority on those questions.

## 1. Punitive Damages.

We have no quarrel with what has been said regarding the standard of proof to be applied in assessing a claim for punitive damages. Consequently, in determining whether substantial evidence supports the trial court's findings, that Allendale's conduct was "wilful, wanton, malicious and in reckless disregard of the rights of the insured," we are required to view the evidence in the light most favorable to the prevailing party, *F & T Co. v. Woods*, 92 N.M. 697, 594 P.2d 745 (1979), and to indulge all reasonable inferences in support of the trial court's decision. *Texas National Theaters, Inc. v. City of Albuquerque*, 97 N.M. 282, 639 P.2d 569 (1982).

Contrary to the well-established rules that it is not the function of an appellate court to weigh the evidence or its credibility, nor to substitute its judgment for the trial court's when the findings are supported by substantial evidence, *Getz v. Equitable Life Assurance Society of the United States*, 90 N.M. 195, 561 P.2d 468, *cert. denied*, 434 U.S. 834, 98 S.Ct. 121, 54 L.Ed.2d 95 (1977), that is what the majority has done in this case.

Judge Bivins contends that, according to the trial court's findings, all of the evidence regarding Allendale's "wrongful conduct," relied on by the trial court was documentary and thus subject to reweighing by the reviewing court. We do not believe the findings on the insurer's conduct can be so narrowly circumscribed, nor do we agree that the reviewing court is so unlimited in assessing documentary evidence. What is not pointed out, moreover, is that some of those "documents" were depositions, and the testimony of witnesses is *not* within any exception to the rule that the court may not reweigh the evidence. Additionally, the case cited in support of the right to re-examine and re-weigh the evidence did not unequivocally so state. *Kosmicki v. Aspen Drilling Co.*, 76 N.M. 234, 414 P.2d 214 (1966), was quoted in *First National Bank* in explication of an alleged exception relied on in *First National Bank*. *Kosmicki* made it clear that this court "has never countenanced a review of documentary evidence to the exclusion of the findings * * * To the contrary, we may only review the documentary evidence to determine whether it supports the findings, and we will not disturb the findings 'unless

such findings are manifestly wrong or clearly opposed to the evidence.' [Citation omitted.]" 91 N.M. 11, 569 P.2d at 424. That means simply that if there is substantial evidence in the documents to support the findings, other contrary evidence in the documents cannot be used to overturn the findings.

Amplifying on the evidence discussed by Justice Riordan and Judge Bivins in their separate opinions, the documents and testimony from Allendale's witnesses established that UNC's and Beker's claims were not the only instances of concern to Allendale. Testimony of Allendale witnesses, as well as inter-company memoranda, disclose that at the time of the Churchrock dam failure, Allendale had been re-evaluating its liability exposure under the "collapse" peril in all of its outstanding policies, because the company had experienced "dramatic increases" (plural) in "catastrophic losses" (plural) far in excess of its estimated annual collapse losses. By its own admissions, those unanticipated claims were the result of Allendale's reluctance to define what it recognized to be an ambigious collapse provision for fear that a definition protective of its liability would adversely affect marketing efforts. It decided, instead, to leave the ambiguity undefined and to deal with each collapse claim on an individual basis, resolute in its goal to reduce its losses under the collapse peril by $10,000,000 per year.

Allendale's internal records provided compelling evidence of its awareness that the collapse peril coverage invited confusion to its insureds with respect to the scope of their collapse coverages. Among Allendale's documents was the legal opinion obtained by one of its affiliates, mentioned by Judge Bivins, that their policies' collapse terms would be broadly construed against the insurer. Although that legal opinion was specifically directed to the gypsum dike failure of one of their insureds, the analysis was sufficient to alert Allendale and its affiliates that construction of the words "earth movement," because it was ambiguous, would probably be restricted to natural occurrences. Interoffice memos recognized and cited cases discussing and holding "collapse" to be an ambiguous term. Still Allendale declined to write a definitive "collapse" coverage provision, preferring "to handle each sticky situation as it developed."

> [I]f the insurer continues to issue, without change, policies, clauses of which have been judicially construed, it will be considered as issuing them with that construction placed on them* * *.

*Patterson v. United States,* 233 F.Supp. 447, 449 (E.D.Tenn.1964) (quoting 44 C.J.S. Insurance § 293.)

Allendale thus was charged with knowing the judicial construction of its unchanged provision. UNC was entitled to believe that it had purchased insurance coverage, not a lawsuit, when it entered into the insurance contract. *See Gulf Atlantic Life Insurance Co. v. Barnes,* 405 So.2d 916 (Ala.1981).

Also among Allendale's records was evidence that Allendale altered its original September, 1978, investigative report of the UNC dam failure to soften its language where inferences of collapse appeared. As examples, "rupture" was changed to "washout"; a reference to where the dam had "failed" was changed to "eroded away," and the words "ruptured," "removed a slice" and "breached" were changed to "washed out" and "eroded." The changes fairly could have been regarded by the trial court as an attempt by Allendale to bolster its decision to deny coverage nine days after the accident and two months before the investigation was completed. There was evidence that Allendale also claimed a "flood damage" exception in coverage, and maintained its liability for businees interruption losses to be substantially lower than provided for, even after it had determined its position on that issue was wrong. Considering these examples and all of the evidence of Allendale's "stonewalling" of its insured's claim, the trial court did not act unreasonably in finding that the refusal to pay UNC's claim was an act of bad faith.

Punitive damages are meant to punish a wrongdoer and to discourage like behavior in others. NMSA 1978, UJI Civ. 18.27 (Repl.Pamp.1980). To be an effective punishment, the award must be high enough, in relation to the defendant's assets, to hurt. *Marriott v. Williams,* 152 Cal. 705, 93 P. 875 (1908). Nonetheless, as with any system of punishment, there must be some correlation between the weight of the penalty and the nature and extent of the wrongdoing. *Faubion v. Tucker,* 58 N.M. 303, 270 P.2d 713 (1954).

UNC contends that the court's punitive award bears a reasonable relationship to the almost $25 million compensatory damages award. It cites *Sierra Blanca Sales Co. v. Newco Industries, Inc.,* 84 N.M. 524, 541–43, 505 P.2d 867, 884–86 (Ct.App.) *cert. denied,* 84 N.M. 512, 505 P.2d 855 (1972), in support of its argument that a ratio of punitive to compensatory damages of approximately one-to-one does not necessarily indicate passion or prejudice, at the same time resisting Allendale's argument on comparative awards in other cases as an inappropriate measure of the correctness of the amount awarded. Of course, it is no more acceptable to compare cases approving one-to-one ratios between compensatory and punitive damages to sustain the award, than it is to compare amounts to punitive awards granted in prior decisions. The appellate court is required, however, to consider the enormity of the wrongful acts committed when reviewing a claim of excessive punitive damages.

In support of the trial court's punitive award of $25 million, UNC points to its projection that Allendale had earned interest of nearly $19 million on the amount of the claimed but unpaid loss by the time of trial. If we consider, however, that the trial court's award of pre-judgment interest should be taken into account as a claim against some of the interest earned by Allendale from date of loss to date of trial, it would be wrong to look at the entire $19 million earned as minimizing the "hurt" for the amount of punitive damages assessed.

In the absence of evidence on the question, we have no assurance that interest of the amount suggested by UNC actually has been earned by Allendale, but we are not so isolated from reality that we cannot assume that, in the 6-plus years since the accident, the insurance company has established a loss reserve fund to cover this claim and has accumulated interest on the fund. If its 6-year average return equalled 12%—an unquestionably conservative average during the 1979–1984 period—its earnings on the loss reserve earmarked for the UNC claim would have approached $16.5 million. Prejudgment interest allowed of approximately $4 million would reduce Allendale's earned interest available to apply on the punitive judgment to $12.5 million. There was evidence that Allendale's total assets at the time were $859 million, and net assets plus cash on hand were approximately $936 million. A wrongdoer's assets are relevant in determining the amount of punitive damages. *Ruiz v. Southern Pacific Transportation Co.,* 97 N.M. 194, 638 P.2d 406 (Ct.App.), *cert. quashed,* 97 N.M. 242, 638 P.2d 1087 (1981). The $25 million punitive award exceeds Allendale's likely minimum interest earnings, offset by its prejudgment interest liability, by $12.5 million; that amount constitutes less than 7.5% of the company's total assets. We are unwilling to say that, even after offsetting the amount of earned interest that may be accounted for by the prejudgment interest award, a penalty equalling little more than 7% of the company's tangible wealth is excessive punishment.

When we consider the purposes for which punitive damages are imposed, and when there is no evidence of passion or prejudice in the trial court's determination, we are obliged to affirm the award.

**2. Attorneys' Fees.**

The trial court awarded attorneys' fees and costs by authority of NMSA 1978, Section 39-2-1, which allows judgment of attorneys' fees if the court finds that an insurer has acted unreasonably in failing to pay plaintiff's claim. From our discussion

of punitive damages, we do not doubt that the trial court properly exercised its discretion in granting fees in this case. Our absence of doubt is enhanced, and our certainty regarding Allendale's unreasonableness is bolstered, by the majority's observation that UNC's damages were ascertainable.

In arriving at the attorney fee award of $3,210,759, the court first determined the number of hours of legal work expended, and multiplied that figure by the attorneys' hourly billing rates, yielding a base or "lodestar" figure of $1,070,253 for 13,738 hours. This amount was then increased by a multiplier of 3 which represented, in the trial court's view, a proper enhancement for the exceptional success of plaintiffs' attorneys in prosecution of the suit, and for the advancement of public policy in litigated insurance claims, as shown by the attainment of punitive damages. Allendale objects to the accuracy of the time and rate factors; it contends further that application of the enhancement factor of 3 was a gross abuse of discretion.

Allendale tells us that the trial court included in its calculations the attorneys' hours spent prior to commencement of litigation, and time used to devise the punitive damages argument. We are not told, however, why those hours should have been excluded, other than that Allendale reads Section 39–2–1 as limiting all fees to actual litigation time. It suggests that the punitive damage claim was separate from UNC's "claim on any type of first party coverage" and for some reason, therefore, hours spent on the punitive claim should have been reduced.

If all legal work undertaken before the filing of the complaint were excluded from charges, attorneys would be encouraged to file suit before first determining the validity, merits and strengths of their clients' position. The claim for punitive damages, where one is indicated, is no less a part of the lawsuit nor to be treated any differently when determining attorneys' fees. Indeed, the statute is specifically addressed to the case where an insured prevails on an insurance claim and the court finds that the insurer unreasonably failed to pay. It consequently contemplates proof of a sort that well may support a punitive damage claim. We are not persuaded that those hours complained of should be eliminated.

Secondly, Allendale alleges error in the trial court's allowance of a Washington, D.C. billing rate for UNC's out-of-state counsel. The company insists that the rate must be adjusted to New Mexico billing standards. The case authority relied on for this proposition, however, specifically leaves such a downward adjustment to the judge's discretion. The trial court acknowledged the special expertise of the Covington firm and considered the factor of local prevailing fees to be intended only as a guide and just one of many factors to be applied.

In our view, the trial court carefully exercised its discretion in establishing the base hourly rates at $74 per hour for the Stephenson firm and $82 per hour for the Covington firm and, in light of the evidence produced on the question, the court may even have erred on the side of conservatism.

Finally, Allendale argues that the court's use of a multiplier to the base figure (termed throughout the briefs as the "lodestar" figure), has a respectable following in the federal courts. *See, e.g., City of Detroit v. Grinnell Corp.*, 560 F.2d 1093 (2d Cir.1977); *McDonald v. Johnson & Johnson*, 546 F.Supp. 324, 335–36 (D.Minn.1982), *rev'd in part on other grounds*, 722 F.2d 1370 (8th Cir.1983); *Bagel Inn, Inc. v. All Star Dairies*, 539 F.Supp. 107 (D.N.J.1982); *Municipal Authority of Bloomsburg v. Pennsylvania*, 527 F.Supp. 982 (M.D.Pa. 1981); *Helfand v. Cenco, Inc.*, 519 F.Supp. 322 (N.D.Ill.1981). The influences for applying a multiplier are the quality of the work performed, the result obtained, the public policy served, and the risk of non-recovery of fees and costs. The trial court deferred to those influences in deciding to enhance the hourly rate basic figure.

According to Allendale, those courts which have applied a multiplier have all

done so in contingency fee cases. We think that is a distinction without a difference. Why a contingent fee lawyer is entitled to enhancement of his fees and a straight fee lawyer is not escapes us when we consider the multiplier factors mentioned in the preceding paragraph.

The enhanced hourly fee in this case actually brings the hourly rate for experienced, competent and successful counsel more into line with prevailing rates locally, as well as throughout the country, and it is still much less than the evidence produced before the trial court from experts would have supported.

We would not disturb the trial court's award for attorney's fees.

In our judgment, the trial court should be sustained on all points.

SOSA, Senior Justice, concurs.